YORK v. ROBBINS et al. (No. 415–3808.)

(Commission of Appeals of Texas, Section B. Nov. 21, 1923.)

1. Mortgages ⊜⇒295(2)—Presumption against merger where mortgagee takes conveyance from mortgagor.

Where a mortgagee takes a conveyance of land from mortgagor, the presumption of an intention to keep the security alive is very strong, as a mortgagee is not bound to pay off either the mortgage or the other incumbrances on the land, and there is nothing to prevent equity from carrying out his presumed intent, by decreeing against a merger.

2. Mortgages ⊜⇒295(1)—Security must be taken in satisfaction of debt to constitute a "merger."

To constitute a merger, mortgaged land must be taken in satisfaction of the contract and not as collateral to it.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Merger.]

3. Mortgages ⊜⇒295(2)—Whether parties intended a merger of estates held a question of fact.

Whether parties to conveyance to mortgagee intended a merger of estates should take place, is a question of fact, and the intention that there should be no merger may be shown by the fact that mortgagee did not release the mortgage, but on the contrary retained it.

4. Mortgages ⊜⇒295(2)—Evidence held to show mortgagee did not intend a merger of estates conveyed by mortgage and quitclaim deed.

Where mortgagor quitclaimed the mortgaged land to the mortgagee, evidence held to show that mortgagee did not intend that estate conveyed to him by the mortgage should be merged in that conveyed by quitclaim deed.

5. Mortgages ⊜⇒295(1)—Merger of estate conveyed by deed with that conveyed by mortgage not effected because of fraud.

That a quitclaim deed was executed to mortgagee to defraud creditors of the mortgagor, and that the mortgagee had knowledge of that intent, would not create a merger of the estate conveyed by deed with that conveyed by mortgage.

6. Mortgages ⊜⇒244(1)—There being no merger, lien of judgment recovered against mortgagee after transfer of mortgage was inferior thereto.

Where the mortgagor quitclaimed to mortgagee, who kept the estates separate and distinct so that there was no merger, lien of judgment recovered against the mortgagee, after the mortgagee had transferred the mortgage

for value, attached only to the estate that remained, and was inferior to the mortgage lien.

Error to Court of Civil Appeals of Seventh Supreme Judicial District.

Trespass to try title by E. R. York against W. A. Robbins and others. From a judgment of the Court of Civil Appeals affirming a judgment for defendants (240 S. W. 603), plaintiff brings error. Reversed and rendered, and remanded in part, with directions.

P. B. Randolph, of Plainview, for plaintiff in error.

A. P. McKinnon, of Floydada, for defendants in error.

HAMILTON, J. E. R. York brought this suit against W. A. Robbins, James K. Green, S. P. McCleskey, Charles R. Steen, and H. C. Boslee for the title and possession of lots Nos. 6, 7, and 8 in block No. 12, Starks addition to the town of Floyd City, Floyd county, Tex., and lots Nos. 10 and 18 in block No. 60, lot No. 2 in block No. 143, and lot No. 10 in block No. 62, in the town of Floyd City, Floyd county, Tex., according to the plot of said town. His petition is in the form of an action in trespass to try title. Robbins filed an original answer disclaiming as to all the land, but by subsequent answer claimed lot 18 in block 60 in the town of Floyd City; Steen claimed lot No. 2, block 143, disclaiming as to all other property; Boslee claimed lot 10, block 62, and disclaimed as to all other property. He set up valuable improvements in good faith, and prayed that he be allowed the value of the improvements. McCleskey claimed lot No. 10 in block 60, disclaiming as to all other property. He pleaded the statute of limitation of five years and set up valuable improvements amounting to $550. Steen claimed lots Nos. 6, 7, and 8, block No. 12, Starks addition to the town of Floyd City, and disclaimed as to all other property. The plaintiff York set up his service as a soldier in the United States army from May 9, 1916, to March 1, 1919, which disposed of the issue of limitation.

E. R. York claimed title to the lots through foreclosure sale under a mortgage executed September 12, 1910, by T. P. Adams to secure B. L. York, plaintiff's brother, in the payment of notes aggregating the principal sum of $1,200. The foreclosure sale was had January 5, 1915. The property was bought in at that sale by B. L. York, acting as the agent of the plaintiff, E. R. York. The trustee's deed was made to B. L. York. He immediately executed a deed in favor of E. R. York, which was filed for record simultaneously with the trustee's deed. The mortgage given by Adams in favor of B. L. York, under foreclosure of which the sale was made and the trustee's deed executed, was filed for record November 15, 1910.

Defendants claim title to the lots by virtue

255 S.W.—46

of a sheriff's deed dated October 11, 1915, made to W. A. Robbins as purchaser under an execution sued out and levied upon certain of the lots in controversy and sold thereunder by virtue of a judgment recovered in the county court of Tarrant county in 1914 against B. L. York for $480.73 and abstracted in Floyd county, December 9, 1914. The other defendants hold only what title Robbins acquired. It was agreed that T. P. Adams was the common source of title.

Defendants' title depends upon whether or not B. L. York had title to the lots, at the date of their sale under execution as the lots of York, superior to the mortgage given by Adams in 1910. As showing the title to the lots was in B. L. York, at that time, defendants depend upon a quitclaim deed executed by Adams in favor of York, following the execution by Adams of the mortgage in York's favor, filed for record December 2, 1910.

The title was before the court without a jury. He rendered judgment against plaintiff in error. This judgment was affirmed by the Court of Civil Appeals. 240 S. W. 603. The Court of Civil Appeals held that the estate conveyed in the deed of trust was merged in the estate conveyed by the quitclaim deed, regardless of whether or not it was the intention of B. L. York that the notes and deed of trust securing them should be kept alive.

"Where the legal estate—for example, the fee—and an equal coextensive equitable estate unite in the same person, the merger takes place in equity, in the absence of acts showing an intention to prevent it, as certainly and as directly as at the law. Under these circumstances, merger is prima facie the equitable as well as legal rule. If, however, the holder of an equitable estate obtains the legal fee, and procures it to be conveyed to a trustee with an express declaration that there shall be no merger, then it seems that a court of equity will not permit a merger in opposition to such a direct intention. Where the owner of a legal estate—as, for example, the fee—acquires by purchase or in any other manner a lesser equitable estate not coextensive and commensurate with his legal estate, or a lesser legal estate, a distinction exists; the merger, although taking place at law, does not necessarily take place in equity; indeed, it may be said that the leaning of equity is then against any merger, and that, prima facie, it does not result. The settled rule of equity is that the intention of the one acquiring the two interests then controls." 2 Pomeroy's, § 788.

[1] "Where a mortgagee takes a conveyance of the land from the mortgagor, or from a grantee of the mortgagor, if the transaction is fair, the presumption of an intention to keep the security alive is very strong. It is generally for the interests of the party in this position that the mortgage should not merge, but should be preserved to retain a

priority over' other incumbrances. As the mortgagee acquiring the land is not the debtor party bound to pay off either the mortgage or the other incumbrances on the land, there is nothing to prevent equity from carrying out his presumed intent, by decreeing against a merger." 2 Pomeroy's, § 793.

"While it is the general rule that, when the title to the land and the mortgage debt become vested in the same person, the mortgage is merged in the title, and becomes extinguished, yet the mortgage may be kept alive for the protection of the purchaser of the title, and there will be no merger contrary to the intention of the parties. 15 Am. & Eng. Enc. Law, p. 319 et seq., citing Pike v. Gleason, 60 Iowa, 150, 14 N. W. 210, and other authorities." Hapgood Shoe Co. v. First Nat. Bank of Crockett, 23 Tex. Civ. App. 506, 56 S. W. 995.

[2] To constitute a merger, the highest security must be taken in satisfaction of the contract debt and not as collateral to it. Stamper v. Johnson, 3 Tex. 1; Graves v. Allen, 66 Tex. 589, 2 S. W. 192.

[3] The question whether or not the parties intended that a merger of estate should take place is a question of fact. It is not settled by a mere recording of the deed. Chase v. Van Meter, 140 Ind. 321, 39 N. E. 455. But the intention that there should be no merger may be shown by the fact that the mortgagee does not cancel or surrender the evidences of the debt or release the mortgage, but on the contrary retains them. Burton v. Perry, 146 Ill. 71, 34 N. E. 60; Dunphy v. Riddle, 86 Ill. 22; Peterborough Savings Bank v. Pierce, 54 Neb. 712, 75 N. W. 20; Coleman, etc., Co. v. Rice, 115 Ga. 510, 42 S. E. 5; Gibbs v. Johnson, 104 Mich. 120, 62 N. W. 145; Quimby v. Williams, 67 N. H. 489, 41 Atl. 862, 68 Am. St. Rep. 685. Such intention may be shown by the fact that the mortgagee assigns the mortgage to a bona fide purchaser representing it as a valid security. Goodwin v. Keney, 47 Conn. 486; Cole v. Beale, 89 Ill. App. 426; James v. Morey, 2 Cow. (N. Y.) 246, 14 Am. Dec. 475; Longfellow v. Barnard, 58 Neb. 612, 79 N. W. 255, 76 Am. St. Rep. 117.

[4] We have carefully read the agreed statement of facts. B. L. York testified by deposition and did not state specifically as to whether he intended the quitclaim deed to satisfy the debt and mortgage or not. The question was not asked him. What he did testify to shows that he did not intend it as a satisfaction of the debt, to secure which the mortgage was given. All the evidence bearing on the question is such as to lead necessarily to one conclusion only, namely that York did not intend that the estate created and conveyed to him by the mortgage should be merged and swallowed up in the estate conveyed to him by the quitclaim deed. Mr. Leake Ayres, assistant cashier of the First National Bank of Gatesville, testified:

"My recollection is, and I find in the records of the bank, that in the spring of 1912, B. L. York executed to the First National Bank of Gatesville five notes of $75 each, and one note of $410, maturing May 1, June 1, July 1, August 1, September 1, and October 15, respectively. These notes were given to cover the balance due on a debt previously owed to the bank by Mr. York. As collateral to this debt, B. L. York pledged to the First National Bank of Gatesville a series of notes given by T. P. Adams to B. L. York and secured by deed of trust on certain land in Floyd county, Tex. Our records do not show how many of these notes we held, but my recollection is that they aggregated something like $1,400 or $1,500.

"Adams made payments from time to time on his notes in favor of B. L. York, and we applied same on the debt of York to the bank. By the payments made by Adams, York's debt to the bank was reduced to $215.90 principal; this amount was sued on and a judgment rendered in the county court of Coryell county, at its September term, 1914, for $215.90 principal, $29.02 interest and $58.19 attorney's fees, with 10 per cent. interest from September 23, 1914, and the costs of the suit. On November 14, 1914, Ed. R. York of Austin, Tex., paid the bank $100 on this judgment and promised to take up the balance in a few days. On December 16, 1914, we received from E. R. York a check for $225 which we accepted in payment of the balance on said judgment and transferred same to him, together with the notes and the deed of trust securing same. * . * *

"E. R. York was in our office in Gatesville, in person, November 14, 1914, and paid $100 on the debt of B. L. York and stated that he would send us the balance from Austin by December 1st. Prior to his payment on November 14, to wit, on November 10, 1914, I had written him a letter as follows: 'Gatesville, Texas, November 10, 1914. Col. E. R. York, Austin, Texas— Dear Ed: As requested by Bert, I hand you herewith the certified copy of the Adams deed of trust: Yours truly, Leake Ayres, Asst. Cashier.'

"On December 12, 1914, I wrote him as follows: 'Gatesville, Texas, December 12, 1914. Col. E. R. York, Austin, Texas—Dear Ed. When you were here, you stated that you would take up the balance of Bert's matter by December 1st. We are exceedingly anxious to get this closed up and would very much appreciate your check. Please favor us and oblige. Yours truly, Leake Ayres, Asst. Cashier.'

"On December 16, 1914. I received the following letter, not dated, and written on the bottom of my letter to E. R. York, of date November 10, 1914: 'Dear Leake: Sending you my check for $225. bal. payment on Adams matter. Please have judgment transferred to me. Send all notes and papers, etc., to me at Austin. This matter would have had attention before this, but I have just returned from a ten day trip. Yours truly, E. R. York.'

"On December 16, 1914, I wrote him again as follows: 'Gatesville, Texas. Dec. 16, 1914. Col. E. R. York, Austin, Texas—Dear Sir: We are in receipt of your letter with check for $225.00 for which we thank you. I hand you herewith: Transfer of judgment; transfer of Adams notes; ten notes signed by Adams; three

cost bills; all of which I trust you will find correct and in order. Yours truly, Leake Ayres, Assistant Cashier.' "

The deposition testimony of T. P. Adams on this phase of the case was:

"I have examined the original quitclaim deed from myself to B. L. York, dated Nov. 19, 1910, heretofore referred to. The deed was executed by me to B. L. York at his request to further secure him and, though it appears from the deed that I received a $1,000 consideration, the fact is I did not receive one cent for the deed. He told me he would not record it unless he saw J. V. Rice was trying to take advantage of me, and York told me that it was for my protection only to give him the deed. It was not my debts but Jay's that I owed Rice, and he said he would protect me against Rice especially when I was only surety for my brother and that he was then trying to get Rice to settle with me. This was the only purpose and reason I made the quitclaim deed, and by agreement it was not to be recorded unless Rice jumped on me. The deed was not to be recorded unless Rice forced collection of Jay's debt. * * *

"To further show you that the recording of the deed did not cancel the notes or the deed of trust which had been executed in 1910, the 12th day of February, 1912, long after the quitclaim deed had been put of record, B. L. York had me renew the notes mentioned in the deed of trust, changing only the installments, and to further show that the deed of trust lien was not canceled I attach to this answer one of the notes just as they were executed to renew the notes given by deed of trust and mark same Exhibit B for identification. Also marked Exhibit C, and attached for identification the cashed and canceled check given May 5, 1913, in payment of the note marked Exhibit B, showing the check was paid to M. L. Ayres of the First National Bank of Gatesville, Tex., and was applied on the York note, and I now here state that this was a part of the same indebtedness originally secured by the deed of trust recorded in Deed of Trust Records of Floyd County, Tex., vol. 4, p. 427, and to show that Leake Ayres, whose initals are M. L., was acting for B. L. York, in collecting these notes, I herewith attach for identification letters from him to me marked Exhibits E and D. I have numerous other checks and notes showing my continued payment on this same indebtedness to York long after he filed the quitclaim deed for record. I never had final settlement on this old matter until I had it with E. R. York in the winter of 1916. The deed was not intended to cancel the deed of trust lien, but was for the sole purposes as heretofore stated."

There is no evidence in the record contradicting the evidence of the transfer of the notes and mortgage to the Gatesville National Bank by B. L. York or contradicting any of the evidence above set out. Nor is there any evidence tending to show that B. L. York ever had an intention to apply the estate conveyed by the quitclaim deed to the payment of the notes or that he ever intended to cancel the mortgage securing the notes, by virtue of the deed.

[5, 6] If it be granted that the quitclaim deed was executed to hinder, delay, and defraud Adams' creditors, and that B. L. York had knowledge of that intent, that fact would not have created a merger of the estate conveyed by the deed with that conveyed by the mortgage. It is true that a fraudulent conveyance is valid and binding between the parties themselves, and can only be set aside by creditors, purchasers, or other persons intended to be defrauded. Stephens v. Adair, 82 Tex. 214, 220.[1] The law, in order to discourage such transactions, would refuse to interfere to aid either party to the fraudulent transaction, and, the legal title being vested in York by the deed, the property was subject to his creditors' debts to the extent of his interest in it, but no further. After the execution and delivery of the quitclaim deed, York was the owner of the entire title, part by virtue of the deed of trust, the remainder by virtue of the quitclaim deed. If, while he thus held all the interest that Adams ever had in the property, the lien, by virtue of which defendants in error hold, had been fixed on the land, the purchaser under foreclosure of that lien would have gotten the whole title. But this is not what occurred in this case. B. L. York, as we have held above, kept the estate conveyed by the mortgage and the estate conveyed by the quitclaim deed separate and distinct. They did not merge. Before the lien, through foreclosure of which defendants in error claim and upon which their title depends, was fixed on York's interest in the property, he transferred the notes and the mortgage securing them to the First National Bank of Gatesville. This bank was the owner of the notes and the mortgage securing them before and at the time the abstract of judgment was recorded in Floyd county. Defendants in error's lien attached to such part of the estate in the land as was not conveyed to the First National Bank of Gatesville. It did not attach to that portion of the estate so conveyed; that is, only such part of the value of the lots was subjected to the creditors of York as was left after satisfaction of the notes and security held by the bank. At the foreclosure sale under the mortgage, the property was bought by E. R. York, and the amount bid on it was credited on the Adams' notes. It did not bring enough to satisfy those notes, and therefore nothing was left to be applied to the satisfaction of the Tarrant county judgment. The mortgage lien was superior to the judgment lien, and the sale under execution based on the judgment conferred no title.

The evidence on the question of the right of those defendants in error to permanent and valuable improvements made in good faith who made such a claim was not suffi-

[1] 18 S. W. 102.

ciently developed. in the trial of the case to indicate whether they are entitled to pay for such improvements or not.

We recommend that the judgments of the district court and Court of Civil Appeals be reversed; that judgment be rendered in favor of plaintiff in error for title and possession of the property; and that the cause be remanded solely for the determination of whether or not Boslee and McCleskey are entitled to reimbursements for improvements made in good faith on the lots claimed by them.

GREENWOOD and PIERSON, JJ. Judgments of district court and Court of Civil Appeals reversed and judgment rendered for plaintiff in error for title and possession of the property in controversy, and cause remanded for the determination of whether Boslee and McCleskey are entitled to compensation for improvements in good faith.

CURETON, C. J., not sitting.