## Marjorie Maddox STEGER, William L. ("Bill") Steger, Jr., and John Marshal Steger, Appellants,

v.

## MUENSTER DRILLING COMPANY, INC., David Keith Miller, Wayne Porter, Chris A. Hess, Doyle E. Hess, Frank F. Hess, Angelo B. Nasche, and Randy Wimmer and Wife, Linda Wimmer, Appellees.

### No. 2–02–228–CV.

Court of Appeals of Texas, Fort Worth.

Dec. 11, 2003.

Rehearing Overruled March 18, 2004.

---

[1]. George Allen, Judge of the 54th District Court of McLennan County, sitting by assignment of the Chief Justice of the Texas Supreme Court pursuant to section 74.003(h) of the Government Code. *See* TEX. GOV'T CODE ANN. § 74.003(h) (Vernon Supp.2004).

W.T. Skip Leake, Arlington, TX, for Appellants.

Gary P. Patton, Addison, TX, Law, Snakard & Gambill and Dabney D. Bassel, Fort Worth, TX, Gibson, Hotchkiss, Roach & Davenport and Marvin H. Brown, Wichita Falls, TX, Jack A. McGaughey, Nacona, TX, for Appellees.

Panel A: CAYCE, C.J.; HOLMAN and GARDNER, JJ.

### OPINION

JOHN CAYCE, Chief Justice.

### I. Introduction

In this will construction case, Marjorie Maddox Steger (Mrs. Steger) and her two sons, William L. ("Bill") Steger, Jr. and John Marshal Steger (the Steger sons), appeal the trial court's judgment that appellees [1] are the owners of the working interests in certain oil and gas leases in Montague County, Texas. Because we conclude that the trial court properly construed the will at issue with respect to Mrs. Steger's claims and that the Steger sons' claims are barred by res judicata, we will affirm the trial court's judgment.

### II. Background Facts and Procedural History

The facts of this case are largely undisputed. Mrs. Steger is the last surviving child of John W. (J.W.) and Carrie T. Maddox, and the Steger sons are her only children. From the 1920s until his death in 1933, J.W. Maddox and his wife, Carrie T. Maddox, owned as their community property approximately 10,646 acres of ranch lands in Montague and Clay Counties, Texas. The Maddoxes' property included the following lands in Montague County:

- 334 acres out of the John Chambliss Survey, A–123, subject to an undivided one-half mineral interest in 50 acres of this tract held by Aaron Cohen (Tract 1);

- All of the C.W. Thompson Survey, A–741, containing 480 acres, more or less, save and except 160 acres of land in the form of a square out of the northwest corner of the survey (Tract 2);

- All of the H.S. Arnold Survey, A–5, containing 320 acres, more or less, subject to an undivided one-half mineral interest in 100 acres of this tract, more or less, held by N.R. Beal (exclusive of the right to receive cash bonuses and delay rentals) (Tract 3);

- 45 acres, more or less, out of the S. Little Survey, A–417, and the W.P. Zuber Survey, A–887 (Tract 4).

In the mid–1920s, the North Nocona Oil Field was discovered and extensively developed. The North Nocona Oil Field has been prolific and is still producing today. Tracts 1–3 of the Maddoxes' land are in the middle of this oil field.

---

1. Appellees are Muenster Drilling Company, Inc., David Keith Miller, Wayne Porter, Chris A. Hess, Doyle E. Hess, Frank F. Hess, Angelo B. Nasche, Randy Wimmer, and Linda Wimmer. Where necessary, we refer to some or all of appellees by name; otherwise, we refer to them collectively as appellees.

During his lifetime, J.W. Maddox leased all of Tracts 1–3 and other lands for oil and gas purposes. He made, as lessor, at least twenty-six oil and gas leases covering various parts of these lands, all of which contained a fixed primary term of years or months and a secondary term of as long as oil or gas is produced in paying quantities. Carrie Maddox was also a lessor on most of these leases, and she had personal knowledge of their terms and provisions.

In 1931, J.W. Maddox hired an attorney to prepare his will. By that time, approximately 175 oil or gas wells had been drilled on the Maddoxes' lands in the North Nocona Oil Field, including more than 150 producing wells. In 1931, the producing wells produced approximately 33,075 barrels of oil per month. The royalties J.W. and Carrie Maddox received in 1930 were between $2,460 and $4,920 per month.

When J.W. Maddox executed his will in July 1931, he was seventy-one years old, and Carrie was fifty-five. J.W. and Carrie had ten children, the youngest of whom— Marjorie (now Mrs. Steger) and Martha Lou—were sixteen and thirteen years old, respectively.

J.W. Maddox died on May 26, 1933, and his will was admitted to probate in Montague County. Carrie served as the independent executrix of J.W.'s estate. Except for cash bequests that are not relevant to this case, J.W.'s will bequeathed to Carrie—as long as she remained unmarried—a life estate in all of his estate, i.e., his one-half interest in their community property (the J.W. Maddox community interest). In the fourth and sixth paragraphs of his will, J.W. gave Carrie the following powers and authority:

- the possession, management, control, and use of the residue of J.W.'s real and personal property during her life;
- full power and authority to manage, control, and lease for all purposes the real and personal property given during her lifetime;
- full power and authority to extract therefrom all oil, gas, and other minerals during her lifetime;
- power and authority to manage and control jointly with her estate all other property; and
- power and authority to collect and have the rents and revenues arising from the entire estate during her life.[2]

2. The fourth and sixth paragraphs of J.W.'s will provided as follows:

> 4th. I give, devise and bequeath unto my beloved wife, Carrie T. Maddox, the residue of my property of which I may die possessed, real, personal and mixed and of every kind and character and regardless of where said property may be located, and regardless of whether same is herein mentioned and described or not, after the payment of the foregoing legacies, to have and to hold by her, the possession, management, control and use of said property for her life time, provided, that, she, the said Carrie T. Maddox remain unmarried after my death, with the remainder thereof at the time of her death or remarriage to my above mentioned ten children, they to participate in my personal estate, share and share alike, the real estate as herein set forth in another paragraph or clause of this

> will, and fully described to have and to hold, all of the above and herein after described real and personal estate during their life time only, with the remainder to their children in fee.

> . . . .

> 6th. It is my desire and I direct, that, Carrie T. Maddox, my wife, shall have fully power and authority and the same is hereby granted to her to, manage, control and lease for all purposes the real and personal estate herein after bequeathed during her life time and to extract therefrom all oil, gas and or other minerals during said period of her life estate as limited herein, and the further power and authority to manage and control jointly with her estate, all other property, collect and have the rents and revenues arising from the entire estate during the period of her life and she remaining unmarried after my death.

J.W.'s will also bequeathed to each of his ten children a secondary life estate, following Carrie's death, in specific parts of the J.W. Maddox community interest. To Martha Lou, he gave a secondary life estate in his community interest in Tracts 1–4 with a fee simple remainder interest to her bodily heirs, subject to a 3/4 royalty interest in favor of J.W.'s other nine children. If Martha Lou died without children, however, the fee simple interest passed to J.W.'s surviving children, share and share alike. Regarding Martha Lou's life estate, in the eighth and nineteenth paragraphs of his will, J.W. gave her the following powers and authority:

- to collect rents and revenues;
- to make leases of whatever nature on the real estate;
- to extract therefrom all oil, gas, and/or other minerals over which she had control during her lifetime.[3]

After J.W.'s death, Carrie, who remained unmarried, owned a life estate in the J.W. Maddox community interest in Tracts 1–4 and a fee estate in her one-half community property interest in these tracts. Also after J.W.'s death, Carrie leased various parts of Tracts 1–3 and other Maddox lands for oil and gas purposes. She made, as lessor, at least forty-two oil and gas leases, each of which—like J.W.'s leases—contained a fixed primary term of years or months and a secondary term of as long as oil or gas is produced in paying quantities. No other beneficiary under J.W.'s will joined Carrie as lessor or separately ratified these leases. However, no Maddox heir, including Mrs. Steger, ever questioned Carrie's authority as life tenant to make oil and gas leases. Instead, Mrs. Steger and her brothers and sisters "just let it alone," and "grabbed those checks and ran ... because it was okay."

By 1959, Martha Lou was married to Dan Hughes, Jr. In 1959, Carrie, as lessor, made two oil and gas leases, known as the J.W. Maddox No. 2 Lease and the J.W. Maddox No. 3 Lease, to Dan. The Maddox No. 2 Lease covered 50 acres out of Tract 1, and the Maddox No. 3 Lease covered 257 acres out of Tract 1, less the 50 acres in the Maddox No. 2 Lease. Both Leases were for a primary term of one year or more and a secondary term of as long thereafter as oil or gas was produced in paying quantities. Oil has been continu-

---

**3.** The eighth and nineteenth paragraphs of J.W.'s will provided as follows:

8th. In the event of the death of my wife, Carrie T. Maddox, and after the payment of the foregoing leagacies [sic] ... I give, devise and bequeath all of the residue of my estate, real, personal and/or mixed, share and share alike, except such real estate as I shall hereinafter set aside for the personal use and benefit of each of my children named above, they to have and to hold same and to collect the rents and revenues, make leases of whatever nature on said real estate as is set aside to each, him or her individually and to enjoy same individually, and to extract therefrom all oil, gas and/or other minerals individually over which he or she may have control, during his or her life time, with the remainder to his, her and/or their bodily heirs in fee.

. . . .

19th.... I give, devise and bequeath, after the life estate of my wife, Carrie T. Maddox, a life estate to my daughter, Martha Lou Maddox, with the fee simple title interest to her bodily heirs, [in Tracts 1–4], with the condition, that, for so long as these above mentioned tracts or parcels of land continues to produce oil in paying quantities after the life estate of my wife, Carrie T. Maddox, the said Martha Lou Maddox, shall have one-fourth of the royalty from same and the rest of my children shall share and share alike in the division of the other three-fourth of the royalty ... with the fee simple title interest to their respective bodily heirs and in the event of the death of either without issue, then to go as made and provided in paragraph five herein.

ously produced in paying quantities from both Leases since 1959.

Carrie Maddox died in January 1960. After Carrie's death, no Maddox heir, including Martha Lou or Mrs. Steger, questioned the continuing validity of the Maddox No. 2 and No. 3 Leases until Mrs. Steger commenced the underlying litigation in 1996.

In her will, Carrie devised to Martha Lou in fee simple all of Carrie's undivided one-half community property interest in Tracts 1–4, subject to a devise of 9/10 of all the production bonuses and oil and gas royalties that Carrie owned at the time of her death to Martha Lou's siblings or their children. Carrie also devised to Martha Lou the exclusive right and power to execute oil and gas leases on Carrie's interest in Tracts 1–4.

In March 1977, Martha Lou, as lessor, made an oil and gas lease known as the J.W. Maddox No. 4 Lease to Dan Hughes, Jr. The Maddox No. 4 Lease covered 80 acres of land out of Tracts 2 and 3. None of J.W. Maddox's will beneficiaries joined this Lease as lessor or separately ratified the Lease; however, they did not question Martha Lou's authority, as life tenant under J.W.'s will, to make the Lease. The Lease's primary term was for twenty years, and its secondary term was for as long thereafter as oil or gas was produced in paying quantities. Oil has been continuously produced in paying quantities from the Maddox No. 4 Lease from October 1977 to the present.

Dan Hughes, Jr. owned, operated, and produced the Maddox No. 2 and 3 Leases from 1959, and the Maddox No. 4 Lease from 1977, until his death in May 1992. After his death, Dan's will was admitted to probate in Dallas County, Texas. In his will, Dan bequeathed to Martha Lou his undivided one-half community property interest in the J.W. Maddox No. 2–4 Leases.

Martha Lou served as independent executor of Dan's estate until her death, at which time L. Durell Hughes began serving as independent executor.

Martha Lou died in May 1993, and her will was admitted to probate in Dallas County. No child was ever born to or adopted by Martha Lou. L. Durell Hughes and Betty Wilkins served as independent co-executors of Martha Lou's estate. In her will, Martha Lou directed that certain of her properties be sold and the proceeds used to pay her debts, expenses of estate administration, and federal and estate taxes, including "[a]ll oil interests that I own, except those oil interests that I inherited from my mother, Carrie T. Maddox, deceased." Martha Lou bequeathed all of the oil, gas, and mineral interests that she had inherited from Carrie to the Steger sons.

In September 1994, Muenster Drilling Company, Inc. purchased from the co-executors of Martha Lou's estate the J.W. Maddox No. 2–4 Leases—which cover only acreage from Tracts 1–3—and all personal property and equipment associated therewith for $756,000. Since the September 1994 sale, Muenster Drilling has operated the Maddox No. 2–4 Leases and has continually produced and sold oil in paying quantities. Muenster Drilling and the other appellees did not purchase, have never owned, and do not claim an interest in any leases covering Tract 4.

Following Martha Lou's death, Mrs. Steger was the sole surviving child of J.W. Maddox and, therefore, was the sole remainderman under J.W.'s will to the J.W. Maddox community interest in Tracts 1–4. In May 1996, Mrs. Steger sued Muenster Drilling and David Keith Miller over the oil, gas, and mineral interests in Tracts 1–4 and the J.W. Maddox Leases. Appellees cross-claimed for declaratory relief and

damages. In 1997, the Steger sons filed a separate suit against Muenster Drilling and Miller over the Maddox Leases, and the suits were consolidated by agreement in January 1998.

In their suit, the Stegers sought to establish their ownership of an undivided mineral interest in Tracts 1–4 under the wills of J.W. Maddox and Martha Lou Maddox Hughes;[4] establish the invalidity of the Maddox No. 2–4 Leases; and obtain an accounting, damages, and attorney's fees from appellees. Appellees raised various affirmative defenses to the Stegers' claims and sought attorney's fees and a declaratory judgment that the J.W. Maddox No. 2–4 Leases are valid and that appellees[5] are the owners in fee simple of the Leases.

The trial court eventually rendered a declaratory judgment for appellees[6] that (1) from September 1, 1994 forward, appellees had owned the working interest[7] in the Maddox No. 2–4 Leases, as well as the personal property and fixtures associated with the Leases; (2) the Stegers did not own and had never owned the Leases or the accompanying personal property and fixtures; and (3) the mineral interests that had reverted to Mrs. Steger as a result of Martha Lou's death and that the Steger sons had inherited under Martha Lou's will were subject to the Leases. The trial court also ruled that Mrs. Steger was estopped from asserting her claims against appellees. The trial court filed findings of fact and conclusions of law in Mrs. Steger's suit. This appeal followed.

## III. Issues on Appeal

In four issues, Mrs. Steger asserts that the trial court:

- misapplied the law governing will interpretation by erroneously concluding that J.W.'s will was both unambiguous and ambiguous;

- erred in interpreting J.W.'s will to authorize Carrie and Martha Lou, as life tenants, to execute oil and gas leases that extended beyond their lifetimes;

- erred in concluding that the Maddox No. 2–4 Leases did not terminate upon Dan Hughes, Jr.'s death under the doctrine of merger of estates; and

- erroneously concluded that Mrs. Steger's claims were barred by estoppel.

In two issues, the Steger sons assert that the trial court:

- improperly granted appellees' motion for summary judgment because the doctrine of res judicata does not bar the Steger sons' claims; and

- improperly denied the Steger sons' motion for partial summary judgment because the J.W. Maddox No. 2–4 Leases terminated upon Dan Hughes, Jr.'s death under the doctrine of merger of estates.

---

**4.** Mrs. Steger sought to establish her interest under J.W.'s will, and the Steger sons sought to establish their interest under Martha Lou's will.

**5.** Appellees expressly did not seek a declaratory judgment that Miller owns the Leases.

**6.** The trial court granted appellees summary judgment against the Steger sons; the claims involving Mrs. Steger were tried to the court. All of the trial court's rulings were then incorporated into a single, final judgment.

**7.** A "working interest" is the right to the mineral interest granted by an oil and gas lease. BLACK'S LAW DICTIONARY 1600 (7th ed.1999). "The term is so called because the lessee acquires the right to work on the lease property to search, develop, and produce oil and gas, and the obligation to pay all costs." *Id.* Throughout this opinion, we refer to an ownership of the working interest in the Maddox Leases and ownership of the Leases interchangeably.

## IV. Res Judicata

In their first issue, the Steger sons assert that the trial court improperly granted appellees summary judgment based on res judicata because this doctrine does not bar the Steger sons' claims to all of the oil, gas, and other minerals contained in Carrie's community interest in Tracts 1–3, which they inherited under Martha Lou's will.

Res judicata is the generic term for a group of related concepts concerning effects given final judgments.[8] Within this general doctrine, there are two principal categories: (1) claim preclusion (also known as res judicata) and (2) issue preclusion (also known as collateral estoppel).[9] Res judicata, or claim preclusion, prevents the relitigation of claims that have been finally adjudicated or that arise out of the same subject matter and therefore, with the exercise of reasonable diligence, could have been litigated in the prior suit.[10] To determine what constitutes the subject matter of a suit, courts examine the factual matters that formed the basis of the claim or claims in the prior litigation, without regard to the form of the action. Any cause of action that arises out of those same facts should, if practicable, be litigated in the same lawsuit.[11]

■■■ The policies behind res judicata reflect the need to bring all litigation to an end, prevent vexatious litigation, maintain stability of court decisions, promote judicial economy, and prevent double recovery.[12] Therefore, res judicata requires proof of the following elements: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action.[13] Parties can be in privity in at least three ways: (1) they can control an action even if they are not parties to it; (2) their interests can be represented by a party to the action; or (3) they can be successors in interest, deriving their claims through a party to the prior action.[14]

■■■ In this case, after Martha Lou's death, the Steger sons claimed they were the owners of the Maddox Leases under Martha Lou's will and made demand upon the independent co-executors of her estate for possession of this property. In response, the co-executors of Martha Lou's estate filed a declaratory judgment action in her probate proceeding. In their pleadings and motion for summary judgment in that case, the co-executors sought:

- a declaratory judgment that, under Martha Lou's will, the Steger sons had (1) no ownership interest or claim of right in the working interest in the Maddox Leases or in the equipment associated with the Leases; and (2) no claim of right, title, or interest in Tracts 1–4 [15]

---

8. *Puga v. Donna Fruit Co.*, 634 S.W.2d 677, 679 (Tex.1982).

9. *Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 628 (Tex.1992).

10. *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652–53 (Tex.1996); *Barr*, 837 S.W.2d at 628, 630–31.

11. *Barr*, 837 S.W.2d at 630.

12. *Id.* at 629.

13. *Amstadt*, 919 S.W.2d at 652.

14. *Id.* at 653; *Getty Oil Co. v. Ins. Co. of N. Am.*, 845 S.W.2d 794, 800–01 (Tex.1992), *cert. denied*, 510 U.S. 820, 114 S.Ct. 76, 126 L.Ed.2d 45 (1993).

15. All claims in the probate proceeding were asserted with respect to Tracts 1–4, rather than Tracts 1–3. Because the parties' dispute in this appeal concerns only the Maddox No. 2–4 Leases, which do not involve Tract 4, we will limit our discussion to Tracts 1–3.

except for their ownership in the royalty interest that Martha Lou received under Carrie's will;

• a permanent injunction prohibiting the Steger sons from, in any way, interfering with the co-executors' (1) operation of the oil and gas properties, (2) collection of the working interest share of the proceeds from production from Tracts 1–4, or (3) sale or attempted sale of Tracts 1–4, as required under Martha Lou's will.

In their pleadings and motion for summary judgment in the probate proceeding, the Steger sons denied the co-executors' claims and counterclaimed for a declaration that

• the Maddox Leases on Tracts 1–4 had terminated at Dan's death, based on the doctrine of merger of estates, and the mineral interest conveyed in the Leases had reverted back to Martha Lou;

• Under Carrie's will, Martha Lou inherited the mineral interests that Carrie owned in Tracts 1–4;

• on the date of Martha Lou's death, there was no working interest in existence with regard to the property that Martha Lou had inherited under Carrie's will; and

• Martha Lou's co-executors had no claim of right, title, or interest in the mineral interests in Tracts 1–4 that Martha Lou had inherited from Carrie.

In March 1994, the probate court granted Martha Lou's co-executors' motion for summary judgment and denied the Steger sons' motion. The probate court also ruled as follows:

[T]he Court hereby declares that under the Will of Martha Lou Hughes, Deceased, Defendants John Steger and Bill Steger have never had a claim of right,

title or interest in and to the working interest in the oil and gas leasehold estates covering the four tracts in Montague County, Texas ... and also in the proceeds from the sale of the working interest share of production, and also have no ownership interest or claim of right in the equipment located thereon or used in connection therewith.

. . . .

IT IS FURTHER ORDERED that Defendants Bill Steger and John Steger are hereby permanently enjoined, restrained and prohibited from, in any way, interfering with the Co–Executors' (i) operating the oil and gas properties on the Four Tracts; (ii) collecting or interfering with collection of the working interests' shares of proceeds from the production from the Four Tracts; and (iii) attempting to sell and/or selling any of the Four Tracts in Montague County.

. . . .

All other relief not expressly granted herein is denied.

The Steger sons appealed the probate court's judgment to the Dallas Court of Appeals, which affirmed the probate court's decision.[16] Thereafter, the Steger sons filed the underlying lawsuit, in which they again sought a declaratory judgment that the Maddox Leases had terminated upon Dan Hughes Jr.'s death and that they owned all of the mineral interests in Tracts 1–3 that Carrie had owned. They also sought a declaration that their mineral interests in Tracts 1–3 were not encumbered by or subject to any valid oil and gas lease with appellees, and they sought an accounting and damages from appellees as a result of appellees' alleged trespass, conversion, and wrongful extraction of oil, gas, and other minerals under the Maddox No.

---

16. *See Steger v. Wilkins,* No. 5–94–784–CV, slip op. at 1, 4, 1995 WL 58887 (Tex.App.- Dallas Feb. 14, 1995, writ denied) (not designated for publication).

2–4 Leases. The Steger sons moved for summary judgment on their claims. In response, appellees raised the affirmative defense of res judicata[17] and moved for summary judgment on that defense, asserting that the Steger sons' claims were barred because they had previously been litigated or could have been litigated to final judgment in Martha Lou's probate proceeding.

We hold that the trial court properly granted appellees summary judgment on their res judicata defense because appellees established all elements of this defense as a matter of law.[18] The factual matters that form the basis of the Steger sons' claims in this case—whether the Maddox No. 2–4 Leases terminated at Dan Hughes Jr.'s death and whether the Steger sons inherited under Martha Lou's will all of the mineral interests in Tracts 1–3 that Carrie had owned—also formed the basis of their claims in Martha Lou's probate proceeding. Therefore, all of the claims that the Steger sons raised in this case were raised or could have been raised in the probate proceeding. Further, identity of parties is established. When appellees purchased the working interests in the Maddox No. 2–4 Leases from Martha Lou's estate, they became Martha Lou's successor in interest[19] to the Leases and are thus in privity with the co-executors of her estate.

 Finally, the prior final judgment element is established by the probate court's rendition of a final judgment on the merits of both the co-executors' and the Steger sons' claims, which the Dallas Court of Appeals affirmed. The Steger sons argue that the probate court's summary judgment does not bar their current claims because the probate court and the Dallas Court of Appeals "[n]ever discussed or actually determined" some of the mineral interest ownership or merger of estates issues that the Steger sons raised in the probate proceeding. A summary judgment need not, however, discuss every ground relied upon for the trial court's ruling.[20] Instead, when a summary judgment rests on more than one ground or defense, the aggrieved party must assign error to each ground on appeal, or the judgment will be affirmed on the ground about which no complaint is made.[21]

Here, the probate court's summary judgment denied the Steger sons' summary judgment motion and granted the co-executors' motion without stating the grounds relied upon for these rulings. The probate court's summary judgment

---

17. See Tex.R. Civ. P. 94.

18. A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense. *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999). To accomplish this, the defendant-movant must present summary judgment evidence that establishes each element of the affirmative defense as a matter of law. *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 121 (Tex.1996).

19. A successor in interest is one who follows another in ownership or control of property, retaining the same rights as the original owner, with no change in substance. Black's Law

Dictionary 1446. Under Texas law, a working interest in an oil and gas lease is a real property interest. *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 436 (Tex.App.-Dallas 2002, pet. denied).

20. See *Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex.1995); *Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 173 (Tex.1995) (both holding that, when summary judgment does not specify ground or grounds for ruling, judgment must be affirmed on appeal if any theories advanced therefor are meritorious).

21. *Scott v. Galusha*, 890 S.W.2d 945, 948 (Tex.App.-Fort Worth 1994, writ denied).

also declared that, under Martha Lou's will, the Steger sons had "never had a claim of right, title or interest" in the working interest in the Maddox Leases, the proceeds from production, or the equipment associated with the Leases. These rulings determined the Steger sons' claims of mineral interest ownership and merger of estates against them with regard to the Leases. The Steger sons do not contend that the Dallas Court of Appeals failed to address any of their appellate challenges to the probate court's summary judgment. Therefore, the probate court's summary judgment is a final judgment on the merits of all the Steger sons' claims.[22]

█ The Steger sons also contend that the prior judgment was not rendered by a court of competent jurisdiction because the probate court would not have had jurisdiction over their trespass to try title and declaratory judgment claims after the Maddox Leases were purportedly sold to appellees in September 1994, i.e., after the Leases were no longer part of Martha Lou's estate. This contention misstates the issue before us. For res judicata purposes, the only relevant inquiry is whether the *prior* final judgment was rendered by a court of competent jurisdiction. The Steger sons do not contend that the pro-

bate court lacked jurisdiction over their claims against the co-executors of Martha Lou's estate. Indeed, they averred in the probate court proceeding:

> This Court [the probate court] has jurisdiction over this matter and venue is proper here pursuant to Texas Probate Code, Sec. 5(E), as the dispute which is the subject [of] this [R]equest for Declaratory and Injunctive Relief involves a "matter incident to the Estate" of Martha Lou Hughes.

Former section 5(e) of the probate code, which was in effect during the pendency of Martha Lou's probate proceeding, provided: "All courts exercising original probate jurisdiction shall have the power to hear all matters incident to an estate." [23] Further, probate code section 5A(b) provides:

> In proceedings in the statutory probate courts, the phrases "appertaining to estates" and "incident to an estate" ... include, but are not limited to, all claims by or against an estate, all actions for trial of title to land[,] ... all actions for trial of the right of property, all actions to construe wills, ... and generally all matters relating to the collection, settlement, partition, and distribution of estates of deceased persons.[24]

---

22. The Steger sons' contention that the probate court's denial of their motion for summary judgment was not a final judgment is wholly without merit. A summary judgment is final if it disposes of all issues and parties. *Lehmann v. Har–Con Corp.*, 39 S.W.3d 191, 192 (Tex.2001). Further, when both parties move for summary judgment and the trial court grants one motion and denies the other, the summary judgment is final and appealable. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 605 (Tex.2002). The probate court's summary judgment disposed of all issues between the parties except the co-executors' claim for damages, which was severed into a separate cause of action at the parties' request so that the summary judgment could

become final. *See City of Beaumont v. Guillory*, 751 S.W.2d 491, 492 (Tex.1988); *Pan Am. Petroleum Corp. v. Tex. Pac. Coal & Oil Co.*, 159 Tex. 550, 324 S.W.2d 200, 201 (1959) (both holding that summary judgment is made final if trial court severs unadjudicated issues and parties).

23. Probate code section 5(e) has since been renumbered as section 5(f) without substantive change. *See* Act of May 1, 2001, 77th Leg., R.S., ch. 63, § 1, 2001 Tex. Gen. Laws 104, 105 (current version at Tex. Prob.Code Ann. § 5(f) (Vernon Supp.2004)).

24. Tex. Prob.Code Ann. § 5A(b).

Clearly, the Steger sons' claims against the co-executors of Martha Lou's estate were "incident to an estate" and fell within the probate court's jurisdiction; therefore, the probate court's judgment was issued by a court of competent jurisdiction.

Because appellees established all the elements of their res judicata defense as a matter of law, the trial court properly granted them summary judgment on the Steger sons' claims based on this ground. We overrule the Steger sons' first issue.[25]

## V. Construction of J.W. Maddox's Will

■■■ In her second issue, Mrs. Steger contends that the trial court erred in construing J.W. Maddox's will as authorizing Carrie and Martha Lou to execute oil and gas leases that extended beyond their lifetimes.[26] The cardinal rule for construing a will is that the testator's intent must be ascertained by looking at the language and provisions of the instrument as a whole, as set forth within its four corners.[27] The question is not what the testator intended to write, but the meaning of the words he actually used.[28] Terms used are to be given their plain, ordinary, and generally accepted meanings unless the instrument itself shows them to have been used in a technical or different sense.[29]

■■■ If possible, all parts of the will must be harmonized, and every sentence, clause, and word must be considered in ascertaining the testator's intent.[30] We must presume that the testator placed nothing meaningless or superfluous in the instrument.[31] Where practicable, a latter clause in a will must be deemed to affirm, not to contradict, an earlier clause in the same will.[32]

25. In light of our holding with regard to this issue, we need not consider the Steger sons' second issue, in which they contend that the trial court improperly denied their motion for summary judgment based on merger of estates. As we have noted, the merger of estates issue was litigated in Martha Lou's probate proceeding and was decided adversely to the Steger sons; therefore, the Steger sons' attempted relitigation of merger of estates is also barred by res judicata. Further, the trial court's clarification, in its summary judgment in this case, that the Steger sons own certain mineral interests in Tracts 1–3—subject to the Maddox No. 2–4 Leases—does not, as the Steger sons assert, affect appellees' res judicata defense concerning the Leases.

26. The trial court's first conclusion of law states:
> When construed from its four corners, the Will of J.W. Maddox authorized his widow, Carrie T. Maddox, as life tenant, to make, as Lessor, the *J.W. Maddox No. 2 Lease* and the *J.W. Maddox No. 3 Lease* covering the J.W. Maddox ½ community property interest in the subject lands and authorized his daughter, Martha Lou Maddox Hughes, as life tenant, to make, as Lessor, the *J.W. Maddox No. 4 Lease* covering the J.W. Maddox ½ community property interest in the subject lands, which leases could extend as long as oil or gas is produced, even if beyond the death of said life tenants.

27. *San Antonio Area Found. v. Lang*, 35 S.W.3d 636, 639 (Tex.2000); *Perfect Union Lodge No. 10 v. Interfirst Bank*, 748 S.W.2d 218, 220 (Tex.1988).

28. *Lang*, 35 S.W.3d at 639; *Shriner's Hosp. for Crippled Children v. Stahl*, 610 S.W.2d 147, 151 (Tex.1980).

29. See *Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996) (construing oil and gas lease); *W. Reserve Life Ins. Co. v. Meadows*, 152 Tex. 559, 261 S.W.2d 554, 557 (1953) (construing contract), *cert. denied*, 347 U.S. 928, 74 S.Ct. 531, 98 L.Ed. 1081 (1954).

30. *Houston v. Harberger*, 377 S.W.2d 673, 677 (Tex.Civ.App.-Fort Worth 1964, writ ref'd n.r.e.); *Irons v. Fort Worth Sand & Gravel Co.*, 260 S.W.2d 629, 631 (Tex.Civ.App.-Fort Worth 1953, writ ref'd n.r.e.).

31. *Irons*, 260 S.W.2d at 631.

■ Whether a will is ambiguous is a question of law for the court.[33] A term is not ambiguous merely because of a simple lack of clarity or because the parties proffer different interpretations of a term.[34] Rather, a will is ambiguous only when the application of established rules of construction leave its terms susceptible to more than one reasonable meaning.[35] If the court can give a certain or definite legal meaning or interpretation to the words used, the will is unambiguous, and the court should construe it as a matter of law.[36]

■ Although a life tenant ordinarily cannot convey an estate that is greater than one tied to her life,[37] the instrument conveying the life estate can confer greater powers upon the life tenant.[38] Thus, a testator or grantor can give the life tenant power to execute oil and gas leases that extend beyond the life tenant's own lifetime.[39] Accordingly, we must decide whether the plain, ordinary meaning of the terms used in J.W. Maddox's will, as a whole, showed his intention to give Carrie and Martha Lou the power to execute oil and gas leases that extended beyond their respective lifetimes.

Paragraph six of J.W.'s will gave Carrie "full[ ] power and authority" to "manage, control and lease" the J.W. Maddox community interest *"for all purposes . . . during her life time and to extract therefrom all oil, gas and or other minerals."* [Emphasis supplied.][40] The word "all" means "every," and "purpose" means "something set up as an object or end to be attained: INTENTION."[41]

Similarly, paragraphs eight and nineteen of J.W.'s will gave Martha Lou power, "during . . . her life time," to "make leases *of whatever nature"* on Tracts 1–3 "and to extract therefrom all oil, gas and/or other minerals . . . over which . . . she may have control." [Emphasis supplied.][42] "What-

**32.** *Harberger*, 377 S.W.2d at 677.

**33.** *Sammons v. Elder*, 940 S.W.2d 276, 280 (Tex.App.-Waco 1997, writ denied); *Nail v. Thompson*, 806 S.W.2d 599, 601 (Tex.App.-Fort Worth 1991, no writ).

**34.** *See DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex.1999); *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951) (both construing contracts).

**35.** *Parks*, 1 S.W.3d at 100; *Davis v. Shanks*, 898 S.W.2d 285, 286 (Tex.1995).

**36.** *Lang*, 35 S.W.3d at 639; *Brown v. Payne*, 142 Tex. 102, 176 S.W.2d 306, 308 (1943); *Wright v. Greenberg*, 2 S.W.3d 666, 672 (Tex.App.-Houston [14th Dist.] 1999, pet. denied).

**37.** *See First Nat'l Bank v. Amarillo Nat'l Bank*, 531 S.W.2d 905, 907 (Tex.Civ.App.-Amarillo 1975, no writ) (stating that life tenant cannot alienate any greater interest in property than interest that ceases with his life); *Benson v. Greenville Nat'l Exch. Bank*, 253 S.W.2d 918, 922 (Tex.Civ.App.-Texarkana 1952, writ ref'd n.r.e.) (stating that life tenant's transfer of her life estate conveys to grantee an estate for life of grantor); *Morris v. Eddins*, 18 Tex.Civ.App. 38, 44 S.W. 203, 204 (1898, writ ref'd) (holding that life tenant grantor could not convey more than a life estate linked to his life).

**38.** *Amarillo Oil Co. v. McBride*, 67 S.W.2d 1098, 1100–01 (Tex.Civ.App.-Amarillo 1934, writ ref'd).

**39.** *See Glass v. Skelly Oil Co.*, 469 S.W.2d 237, 239, 241 (Tex.Civ.App.-El Paso 1971, writ ref'd n.r.e.); *Amarillo Oil Co.*, 67 S.W.2d at 1100–01.

**40.** *See supra* note 2.

**41.** MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 29, 949 (10th ed.1994).

**42.** *See supra* note 3.

ever" means "of any kind at all." [43] "Nature" means "a kind or class usu[ally] distinguished by fundamental or essential characteristics." [44] Construing these terms in accordance with their ordinary meanings, we hold that J.W.'s will unambiguously authorized Carrie to lease his half of the community for every end that she sought to attain, including the end of making oil and gas leases that extended beyond her lifetime, and gave Martha Lou the power to execute oil and gas leases of any kind or class at all, including those that extended beyond her lifetime.

 In light of this unambiguous language, we decline to hold, as Mrs. Steger urges, that the *time limits* J.W. placed on Carrie's exercise of the powers granted to her—her lifetime—limited the *types* of leases she could enter. Although Carrie was only authorized to extract oil and gas during her lifetime, her authority to lease for all purposes allowed her to enter into oil and gas leases that extended beyond her lifetime, even though she could not personally benefit from such leases after her death. Indeed, if a life tenant is granted the power to lease, but cannot bind future interests, "there is very little utility to the power because of the natural reluctance of any lessee to accept a lease which might be terminated by the death of the lessor." [45]

Further, paragraph nineteen of J.W.'s will expressly provided that the life estate in Tracts 1–3 bequeathed to Martha Lou was subject to a 3/4 oil royalty interest in favor of her siblings for as long as these tracts continued to produce oil in paying quantities after Carrie's life estate. [46] This provision affirms J.W.'s grant of authority to Carrie in paragraph six and further evidences his intent that she would enter into oil and gas leases on his half of the community property that extended beyond her lifetime.

Mrs. Steger argues that the oil royalty bequest "merely deal[t] with the division of royalties arising from any extraction of oil or gas that might occur after Carrie['s death]" and did not give any life tenant the power to execute oil and gas leases that extended beyond her lifetime. We disagree. The bequest only divided royalties on oil production from Tracts 1–3 that *continued* after Carrie's death; thus, the bequest presumed that, at Carrie's death, Tracts 1–3 would be subject to leases that continued after her lifetime. Such leases would include both the still-producing leases that J.W. had entered and the still-producing leases that Carrie had entered; the will made no distinction between the two.

Moreover, the construction of paragraph nineteen that Mrs. Steger urges would have defeated the entire bequest of the oil royalty to J.W.'s children—including Mrs. Steger and Martha Lou—in any leases that Carrie had entered on Tracts 1–3 during her life tenancy because such leases would have terminated at Carrie's death. Such a construction is unreasonable because it does not give full effect to J.W.'s expressed intention that his children would share the royalties on all of the oil production that continued on Tracts 1–3 after Carrie's death. [47]

---

43. MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1345.

44. *Id.* at 774.

45. 1 EUGENE KUNTZ, A TREATISE ON THE LAW OF OIL AND GAS § 8.1, at 214 (1987).

46. *See supra* note 3.

47. *Edds v. Mitchell*, 143 Tex. 307, 184 S.W.2d 823, 826 (1945); *Glass*, 469 S.W.2d at 241.

Finally, the power to extract oil, gas, and other minerals—which J.W. expressly gave to both Carrie and Martha Lou—is a power to dispose of the corpus that ordinarily belongs to the remaindermen under a will rather than the life tenant.[48] Oil royalties are likewise part of the corpus and, as such, are reserved for the remaindermen.[49] These powers of disposition can, however, be granted to the life tenants by the testator, as they were in this case.[50] Courts will construe such provisions to give the fullest effect to the testator's intentions.[51] Construing all of these provisions in harmony with one another, we hold, as a matter of law, that J.W.'s will unambiguously shows his intention to give his wife and children, as life

tenants, full power and authority to dispose of all the oil and gas on the properties bequeathed to them during their lifetimes if they so chose—including the power to execute oil and gas leases that extended beyond their lifetimes. Accordingly, we hold that the trial court's conclusion of law is correct. We overrule Mrs. Steger's second issue.[52]

## VI. Merger of Estates

In her third issue, Mrs. Steger contends that the trial court erred in concluding that the Maddox No. 2–4 Leases on Tracts 1–3 did not terminate at Dan Hughes, Jr.'s death under the doctrine of merger of estates and in making the fact-findings that support this conclusion.[53] The Mad-

48. *See Clyde v. Hamilton,* 414 S.W.2d 434, 439 (Tex.1967); *Swayne v. Lone Acre Oil Co.,* 98 Tex. 597, 86 S.W. 740, 743 (1905).

49. *Clyde,* 414 S.W.2d at 439; *Enserch Expl., Inc. v. Wimmer,* 718 S.W.2d 308, 310 (Tex. App.-Amarillo 1986, writ ref'd n.r.e.).

50. *See Cooley v. Williams,* 31 S.W.3d 810, 813 (Tex.App.-Houston [1st Dist.] 2000, no pet.) (stating that life tenant may expressly be given unlimited power to dispose of property during his lifetime, and that exercise of such power defeats remainderman's interest in same); *Glass,* 469 S.W.2d at 241 (holding that creator of life estate may empower life tenant to dispose of corpus). Ordinarily, a life tenant is entitled to exclusive possession and control of the property during her lifetime, along with the revenue and income therefrom, but she has no right to remove the minerals, including oil, from the land. *Swayne,* 86 S.W. at 743; *Enserch Expl.,* 718 S.W.2d at 310. Unextracted oil and other minerals are part of the land, and their removal constitutes disposition of the corpus of the estate, or "waste." *Moore v. Vines,* 474 S.W.2d 437, 439 (Tex. 1971); *Clyde,* 414 S.W.2d at 439; *Swayne,* 86 S.W. at 743. Here, it is undisputed that J.W.'s will unambiguously gave both Carrie and Martha Lou the right to extract oil and gas during their respective lifetimes; the only dispute concerns whether the will gave Carrie and Martha Lou the right to execute oil and

gas leases that extended beyond their lifetimes.

51. *Edds,* 184 S.W.2d at 826; *Glass,* 469 S.W.2d at 241; *see also* KUNTZ, *supra* note 45, § 8.1, at 214 (stating that instrument granting power to lease for oil and gas should be construed liberally to give greatest latitude possible to holder of power and thereby serve grantor's objectives in creating power).

52. In light of this holding, we need not consider Mrs. Steger's first and fourth issues, in which she complains of the trial court's alternative conclusion that J.W.'s will was ambiguous and its conclusion that she was estopped from asserting her claims. *See* TEX.R.APP. P. 47.1 (providing that appellate court need only address issues necessary to final disposition of appeal).

53. In fact-findings 57, 59, and 60, the trial court found:

57. Martha Lou Maddox Hughes did not, in any manner, on or after the death of her husband, Dan Hughes, Jr., express any intention that the *J.W. Maddox No. 2 Lease,* the *J.W. Maddox No. 3 Lease* and/or the *J.W. Maddox No. 4 Lease* merge into said Martha Lou Maddox Hughes' other interests in [Tracts 1–3].

. . . .

59. Such merger of the *J.W. Maddox No. 2 Lease,* the *J.W. Maddox No. 3 Lease* and/or

dox No. 2–4 Leases were made by Carrie and Martha Lou, respectively, as lessors, to Dan Hughes, Jr., as lessee. In his will, Dan devised his community property interest in the Maddox No. 2–4 Leases to Martha Lou. Mrs. Steger asserts that, after Dan's death, the interest in the Leases that Martha Lou inherited under Dan's will merged with her other interests in Tracts 1–3, namely the interests that she inherited from J.W. and Carrie. Mrs. Steger argues that merger is presumed because the greater and lesser mineral estates in Tracts 1–3 were united in Martha Lou after Dan's death and there is no competent evidence that Martha Lou did not intend for a merger to occur.

 Merger of estates is the absorption of a lesser estate in land into the greater;[54] however, application of this doctrine is disfavored in Texas.[55] For merger to occur, the following elements must be present: (1) there must be a greater and lesser estate; (2) both estates must unite in the same owner; (3) both estates must be owned in the same right; (4) there must not be an intervening estate; (5) merger must not be contrary to the intention of the owner of the two estates; and (6) merger must not be disadvantageous to the owner of the two estates.[56]

 The issue of whether a merger of estates was intended is ordinarily a question of fact that is determined by considering the estate owner's interest and all attending circumstances.[57] Equity will not, however, decree a merger of estates when it would be disadvantageous to the person acquiring both interests.[58] Thus, if, "from all the circumstances, a merger would be disastrous to the party holding both estates, then his intention that it

---

the *J.W. Maddox No. 4 Lease* into said Martha Lou Maddox Hughes' other interests in [Tracts 1–3] was contrary to the testamentary intention Martha Lou Maddox Hughes expressed in . . . her Will. . . .

. . . .

60. Such merger of the *J.W. Maddox No. 2 Lease*, the *J.W. Maddox No. 3 Lease* and/or the *J.W. Maddox No. 4·Lease* into said Martha Lou Maddox Hughes' other mineral interests in [Tracts 1–3] would have been disadvantageous to said Martha Lou Maddox Hughes and her estate.

Based on these findings, the trial court concluded:

3. Following the death of Dan Hughes, Jr., the *J.W. Maddox No. 2 Lease*, the *J.W. Maddox No. 3 Lease* and the *J.W. Maddox No. 4 Lease* insofar as the same cover the J.W. Maddox ½ community property interest in the subject lands did not merge into Martha Lou Maddox Hughes' other interests in and to the lands covered thereby.

**54.** *Humphreys–Mexia Co. v. Gammon*, 113 Tex. 247, 254 S.W. 296, 301 (1923).

**55.** *See Ferguson v. Ragland*, 243 S.W. 721, 724 (Tex.Civ.App.-San Antonio 1922, writ ref'd) (referring to merger as "the rankest technical rule"); *see also Montgomery v. Browder*, 930 S.W.2d 772, 781 (Tex.App.-Amarillo 1996, writ denied) (op. on reh'g); *Smith v. U.S. Nat'l Bank*, 767 S.W.2d 820, 823 (Tex.App.-Texarkana 1989, writ denied); *West v. Seigler*, 265 S.W.2d 618, 620–21 (Tex.Civ. App.-Fort Worth 1954, writ ref'd n.r.e.); *Huselby v. Allison*, 25 S.W.2d 1108, 1112–13 (Tex.Civ.App.-Amarillo 1930, writ dism'd w.o.j.).

**56.** *Flag–Redfern Oil Co. v. Humble Expl. Co.*, 744 S.W.2d 6, 9 (Tex.1987); *Humphreys–Mexia Co.*, 254 S.W. at 302. There is some indication in case law that a prima facie presumption of merger arises from the union of greater and lesser estates in the same person; however, this presumption is rebutted by evidence that the owner of the estates did not intend for a merger to occur. *York v. Robbins*, 240 S.W. 603, 606 (Tex.Civ.App.-Amarillo 1922), *rev'd on other grounds*, 255 S.W. 720 (Tex. Comm'n App.1923, judgm't adopted).

**57.** *York*, 255 S.W. at 722; *York*, 240 S.W. at 606.

**58.** *Smith*, 767 S.W.2d at 823.

should not result will be presumed."[59] Further, when the evidence shows that it was in the interest of the owner of the estates that they remain separate, the law presumes an intent corresponding with such an interest.[60]

▮ In this case, there is no evidence that Martha Lou intended the interest in the Maddox No. 2–4 Leases that she inherited from Dan to merge into her other estates in Tracts 1–3. To the contrary, Martha Lou's will evidences her intent that a merger of estates not occur. Martha Lou's will directed her executors to sell "[a]ll oil interests that I own, except those oil interests that I inherited from my mother, Carrie T. Maddox, deceased" and use the proceeds to pay her estate taxes, which, according to her federal and state estate tax returns, were approximately $441,000. The inventory, appraisement, and list of claims filed in Martha Lou's estate shows that, if the Maddox No. 2–4 Leases were excluded, the proceeds from the sale of her oil properties would have been far too little to cover her estate taxes.

In addition, Cooper Blankenship, Dan and Martha Lou's estate planning attorney, testified that Martha Lou never evidenced any intent after Dan's death that the interest in the leasehold estates she had inherited from Dan should merge into her other estates in Tracts 1–3. Blankenship testified that, to the contrary, Martha Lou continued to operate and produce all three of the Leases after Dan's death, to receive all proceeds of production attributable to the leasehold estates, and to pay all operating and production expenses. Blankenship's testimony, coupled with the directive in Martha Lou's will, shows that Martha Lou did not intend for the interest in the Maddox Leases that she had inherited under Dan's will to merge into her other estates in Tracts 1–3.[61]

Further, this same evidence shows that merger of the Maddox No. 2–4 Leases into Martha Lou's other estates in Tracts 1–3 would have been disadvantageous to her: merger would have precluded her from paying her estate taxes with proceeds from the sale of her oil interests. In light of this uncontroverted evidence that a merger of estates would have been contrary to Martha Lou's stated intentions in her will, and therefore disadvantageous to her, a presumption arose that no merger was intended. We therefore hold that the evi-

---

59. *Huselby*, 25 S.W.2d at 1112–13.

60. *Smith*, 767 S.W.2d at 823; *Ferguson*, 243 S.W. at 724.

61. Although Mrs. Steger asserts that she objected to appellees' evidence in the trial court on various grounds, she does not direct us to any objections pertinent to merger or to her complaint on appeal that the evidence did not comply with the statute of frauds. Therefore, these complaints are waived. *See* Tex R.App. P. 33.1(a); *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex.1991) (op. on reh'g); *see also Rogers v. Stell*, 835 S.W.2d 100, 101 (Tex.1992) (holding that complaint on appeal must be same as raised in trial court). Also waived, due to inadequate briefing, is Mrs. Steger's argument that Martha Lou could not dispose of the Maddox No. 2–4 Leases in her will because she did not own a remainder interest in the J.W. Maddox community interest. *See* Tex.R.App. P. 38.1(h) (providing that brief must contain clear and concise argument for contentions made, along with appropriate citations to authorities); *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex.1994) (citing long-standing rule that point may be waived due to inadequate briefing). The Internal Revenue Code provisions on which Mrs. Steger relies are irrelevant to what interests a testatrix may dispose of in her will. *See* 26 U.S.C.A. §§ 2033, 2036–2037 (West 2002) (providing that value of decedent's gross estate for estate tax purposes must include value of all property interests at her death, including life estates retained in property transferred during her life and transfers taking effect at her death).

dence supports the trial court's fact-findings and conclusion that no merger occurred. We overrule Mrs. Steger's third issue.

## VII. Conclusion

Having disposed of all the Stegers' issues on appeal, we affirm the trial court's judgment.