In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-09-00081-CV


______________________________




IN RE:


ESTATE OF GEORGE SLAUGHTER, DECEASED







 


On Appeal from the County Court at Law


 Harrison County, Texas


Trial Court No. 7030




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Chief Justice Morriss



O P I N I O N


 When George Slaughter drafted his holographic will in 1955, little could he foresee that this
brief, handwritten document would become the subject of litigation in the year 2009. This case is
an appeal from a declaratory judgment interpreting the Will of Slaughter. 

 The issue before us is whether Slaughter intended to devise all of the mineral rights in his
estate to his three sons to be held in common or whether he intended to devise only the royalties to
his three sons to be held in common, with the remainder of the mineral estate passing to each of the
sons in equal but separate interests. 

 The trial court determined the will to be patently ambiguous and determined Slaughter's
intent was to devise all of the mineral rights to his three sons, to be held in common. Because we
find the will to be unambiguous, and because the trial court erred in failing to ascribe the ordinary
and generally accepted meaning to the language of the will, we reverse the judgment of the trial court
and render judgment favoring the position espoused by Cary Abney, the independent executor of
Slaughter's estate, as more particularly set out at the end of this opinion.

 When Slaughter died in 1965, he left a holographic will, (1) which bequeathed to each of his
three sons 158 acres of land, thus equally dividing Slaughter's real property. After Slaughter's will
was probated, his sons (2) partitioned the property (into three 158-acre tracts) per deed recorded in the
deed records of Harrison County, Texas. No questions were raised regarding the holographic will
until 2006 when Tommy Slaughter died and Abney became independent executor of his estate.
Questions arose regarding the correct interpretation of Slaughter's holographic will when Abney
attempted to lease the minerals beneath certain lands that were specifically devised to Tommy.

 The will provides, inter alia, that each of Slaughter's three sons is to "share and share alike
production royalty and unproduction royalty." This clause is the only exception or reservation to the
otherwise comprehensive bequest as to specific parcels of land to each of Slaughter's three sons. 

 To obtain clarity and certainty regarding the disputed language in the will, Abney filed an
application for declaratory judgment (3) asking the trial court to declare the ownership of the mineral
estate (including royalty interests and executive rights) in and to all the lands Slaughter owned at the
time of his death. (4) Charley and Willie answered the declaratory judgment action, contesting the
relief sought. (5)

 After a hearing, (6) the court issued its judgment, concluding that each of the three sons and/or
legal representatives of their estates are entitled to the executive rights to lease the mineral interests
of the mineral estate located under the surface estate to each. The judgment further ordered that all
income derived from the mineral estate of the lands of George, "including lease bonus payments,
delay rentals, and royalties, shall be divided equally among the three interest owners of the minerals
and royalties . . . ." 

 Abney appeals, claiming the trial court erred in failing to apply the ordinary, accepted, and
legal meaning of certain words and terms within the will pertaining to the excepted portion of the
mineral estate from the bequests of real property to each of Slaughter's sons. The dispute centers
on paragraph five (7) of the holographic will. That paragraph provides that each Slaughter son is to
"share and share alike production royalty and unproduction royalty." The parties disagree as to what
portion of the fee title of the allocated parcels of land identified in Slaughter's will is covered and
controlled by the preceding language. Abney contends that only the royalty that may be produced
from such lands is covered by the language at issue. Charley and the estate of Willie contend that
the referenced language effectively severed the surface and mineral estates as to the respective tracts
of land and vested each son with the surface estate of the land devised to him along with an
undivided one-third interest in the mineral estates (including royalty income) under the entirety of
the land devised in the will. The issue before the trial court was whether the referenced language
covers the entire mineral estate or whether it is limited to that portion of the full mineral estate which
is designated as royalty.

 1. Standard of Review

 The determination of whether a will is ambiguous is a question of law. Harris v. Hines, 137
S.W.3d 898, 903 (Tex. App.--Texarkana 2004, no pet.); Hurley v. Moody Nat'l Bank of Galveston,
98 S.W.3d 307, 310 (Tex. App.--Houston [1st Dist.] 2003, no pet.). If the court can give a certain
or definite legal meaning or interpretation to the words used, the will is unambiguous, and the court
should construe it as a matter of law. Steger v. Muenster Drilling Co., 134 S.W.3d 359, 373 (Tex.
App.--Fort Worth 2003, pet. denied). Questions of law are reviewed de novo. Harris, 137 S.W.3d
at 903; see also Cherokee Water Co. v. Freeman, 33 S.W.3d 349, 353 (Tex. App.--Texarkana 2000,
no pet.) (whether deed is ambiguous is question of law subject to de novo review). There were no
factual matters at issue in this case; the only issue before the trial court was the application of the law
to the facts. Even in those cases of ambiguous instruments, if the extrinsic evidence is undisputed
as to the circumstances, the construction is still a question of law for the court. Brown v. Payne,
1142 Tex. 102, 76 S.W.2d 306, 308 (1943); In re Estate of O'Hara, 549 S.W.2d 233, 238 (Tex. Civ.
App.--Dallas 1977, no writ); see also Taylor v. Baten, 481 S.W.2d 450, 451 (Tex. Civ.
App.--Beaumont 1972, no writ). We will, therefore, review the trial court's determination of
whether the will is ambiguous under a de novo standard of review. In a de novo review, no
deference is accorded to the trial court's decision. Quick v. City of Austin, 7 S.W.3d 109, 116 (Tex.
1998).

 2. A Bundle of Mineral Rights

 All land in Texas is comprised of separate corporeal estates in the minerals and in the surface. 
Bagby v. Bredthauer, 627 S.W.2d 190 (Tex. App.--Austin 1981, no writ). As to the separate estate
known as the mineral estate, it is well settled that such estate is comprised of five separate and
distinct parts. "A mineral estate consists of five interests: 1) the right to develop, 2) the right to
lease, 3) the right to receive bonus payments, 4) the right to receive delay rentals, and 5) the right to
receive royalty payments." French v. Chevron U.S.A., 896 S.W.2d 795, 797 (Tex. 1995) (citing
Altman v. Blake, 712 S.W.2d 117, 118 (Tex. 1986)); see Veterans Land Bd. v. Lesley, 281 S.W.3d
602, 615 (Tex. App.--Eastland 2009, pet. filed). When a mineral estate is conveyed, all interests
are transferred unless they are specifically reserved to the grantor. Lesley, 281 S.W.3d at 616;
French v. Chevron U.S.A., Inc., 871 S.W.2d 276, 278 (Tex. App.--El Paso 1994), aff'd, 896 S.W.2d
795 (Tex. 1995); Prairie Producing Co. v. Schlachter, 786 S.W.2d 409, 412 (Tex. App.--Texarkana
1990, writ denied). 

 The words "royalty," "bonus," and "rentals" have a well understood meaning in the
oil and gas business. Likewise, "minerals" and "mineral rights" have a well
recognized meaning. Broadly speaking a reservation of minerals or mineral rights
without limitation would include royalties, bonuses and rentals. A conveyance of
land without reservations would include all minerals and mineral rights. However,
it is well settled that a grantor may reserve minerals or mineral rights and he may also
reserve royalties, bonuses and rentals, either one, more or all. Here we have a
reservation only of "royalty rights." It is obvious, it seems to us, that this does not
include a reservation of bonuses or rentals, but only of an interest in oil, gas or
minerals paid, received or realized as "royalty" under any lease existing on the land
at the time of the reservation, or thereafter executed by the grantee, his heirs or
assigns.


Schlittler v. Smith, 128 Tex. 628, 101 S.W.2d 543, 544 (1937). Further, a royalty interest is
nonparticipating in nature, and does not entitle the owner to any share of ordinary cash or other
bonuses, or of delay rentals. Masterson v. Gulf Oil Corp., 301 S.W.2d 486, 488 (Tex. Civ.
App.--Galveston 1957, writ ref'd n.r.e.).

 Here, we must determine the proper ownership of the mineral rights Slaughter devised to his
sons. In making this determination, we apply the accepted principles of will construction.

 3. Standards for Will Construction

 The cardinal rule for construing a will is to ascertain the true intent of the testator as
expressed in the will. San Antonio Area Found. v. Lang, 35 S.W.3d 636, 639 (Tex. 2000); Shriner's
Hosp. for Crippled Children of Tex. v. Stahl, 610 S.W.2d 147, 151 (Tex. 1980). When the will itself
is unambiguous, we do not go beyond the will's specific terms in search of the testator's intent. 
Lang, 35 S.W.3d at 639. A will is ambiguous only when the established rules of construction leave
its terms susceptible to more than one reasonable meaning. Steger, 134 S.W.3d at 373. Such
ambiguity does not arise merely because the parties disagree on the will's interpretation or because
of a simple lack of clarity. See DeWitt County Elec. Coop., Inc. v. Parks, 1 S.W.3d 96, 100 (Tex.
1999) (construing a contract). The will is unambiguous if the court can give a certain or definite
legal meaning or interpretation to the words used. Id. 

 The question, therefore, is not what the testator intended to write, but the meaning of the
words he or she actually used. Lang, 35 S.W.3d at 639. In this regard, the terms of the will are to
be ascribed their plain, ordinary, and generally accepted meanings, unless the instrument itself shows 
such terms to have been used in a technical or a different sense. Steger, 134 S.W.3d at 372; Heritage
Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996) (construing oil and gas lease). When
possible, all parts of the will must be harmonized, and a latter clause in a will must be deemed to
affirm, not to contradict, an earlier clause in the same will. Steger, 134 S.W.3d at 372. "In this light,
courts must not redraft wills to vary or add provisions 'under the guise of construction of the
language of the will' to reach a presumed intent." Stahl, 610 S.W.2d at 151.

 4. Construction of Slaughter's Will

 Slaughter devised to each of his three sons (all living at the time of his death) 158 acres of 
real property. Slaughter also devised to each of his sons "the production and unproduction royalty"
in that property, to be shared and shared alike. We must determine if Slaughter's intent in drafting
this language was to vest his three sons jointly with the mineral estate underlying the entirety of
Slaughter's real property, or whether Slaughter intended to devise to each son the surface and
mineral estates of their respective tracts of land (as designated in Slaughter's will) except the right
to receive royalties or payments in lieu of royalties. 

 We note at the outset that there is no evidence in the record as to Slaughter's intent, other
than the will itself. Slaughter died over forty years ago, and no evidence of Slaughter's original
intent was introduced at trial. (8)

 Charley and the estate of Sidney contend that Slaughter's intent that the sons share equally
in the mineral estate is evidenced by paragraph four and the second paragraph five of the will. 
Paragraph four provides that each son shall "share and share alike all stock, all farm tools, money
in banks." The second paragraph five provides that "each one, same interes [sic] in each piece of
royalty. Can't sell royalty nor land . . . ." While paragraph four evidences an intent that the sons
share equally in Slaughter's personal property, it says nothing about the mineral estate. It is
contended that the second paragraph five is reflective of Slaughter's lack of education, and the
conclusion is drawn that it would therefore be inappropriate to attribute to Slaughter knowledge of
the various interests which comprise the mineral estate. (9) 

 Charley and the estate of Sidney further rely for their position on two items of extrinsic
evidence: (1) precedent established in the forty plus years since Slaughter's demise, during which
time the sons partitioned the surface estate, but left the mineral estate intact; and (2) the fact that each
son executed, at different intervals, leases on the same tract of land. 

 Accordingly, Charlie and Sidney's estate suggest that the term "royalty" in Slaughter's will
actually meant "minerals." They contend the will is ambiguous because its language is imprecise
(although there is no discussion regarding what language is claimed to be imprecise).

 Indeed, the trial court determined the phrase "unproduction royalty" to be patently
ambiguous. The court was then able to consider extrinsic evidence of Slaughter's intent. See Lang,
35 S.W.3d at 639. In its determination of Slaughter's intent, it appears that the only extrinsic
evidence on which the court relied (10) was the partition deed (in which the sons partitioned the surface
only). Because the will is unambiguous, the consideration of extrinsic evidence in this circumstance
was error. 

 Of the five attributes of the mineral estate, the right to receive royalties was excepted as a part
of the separated mineral estate passing to each of the Slaughter sons as part of the devises of their
separate tracts of land. Schlachter makes it clear that the right to receive royalties is neither the
executive right, nor is it the right to receive bonus payments; these are separate, distinct, and
independent of each other. Schlachter, 786 S.W.2d at 412-13. The terms "royalty," "bonus," and
"rentals" all have well established meanings in the oil and gas business. Schlittler, 101 S.W.2d at
544. A conveyance of land with no reservations would include a conveyance of the mineral rights. 
However, a grantor is free to reserve royalties, bonuses, rentals or either one, more, or all. Id. Here,
as in Schlittler, there is a reservation of only royalties, albeit in an unusual turn of phrase. There was
no reservation of the executive right, bonuses, or rentals. While Slaughter was free to reserve the
executive right, bonuses, delay rentals, or all of these, he did not. Had Slaughter intended to divide
the entire mineral estate into equal undivided one-third portions among his three sons, one simple
way to accomplish that intent would be to state that the sons "share and share alike in the mineral
estate." Here, the term "mineral" is never used. The sole reservation is to "production royalty and
unproduction royalty."

 Under established rules of will construction, this Court is bound to attribute to the words used 
their plain, ordinary, and generally accepted meanings. Steger, 134 S.W.3d at 372. "Production
royalty" most certainly has a clear meaning. The challenge here is the unusual expression,
"unproduction royalty."

 The term "royalty" has a generally accepted meaning within the oil and gas industry, as do 
each of the attributes of the mineral estate. "Bonus" is defined as "[A] payment that is made in
addition to royalties and rent as an incentive for a lessor to sign an oil-and-gas lease." Black's Law
Dictionary 206 (9th ed. 2009). "Delay rental" is defined as "a periodic payment made by an oil-and-gas lessee to postpone exploration during the primary lease term." Black's Law Dictionary 
1411. "Executive right" is defined as "the exclusive right to lease specified land or mineral rights. 
The executive right is one of the incidents of the mineral interest." Black's Law Dictionary 651. 
"Royalty interest" is defined as "a share of production-or the value or proceeds of production, free
of the costs of production-when and if there is production." Black's Law Dictionary 1446. 
"Shut-in-royalty" is defined as "a payment made by an oil-and-gas lessee to the lessor to keep the
lease in force when a well capable of producing is not utilized because there is no market for the oil
and gas." Black's Law Dictionary 1446.

 The term "royalty" is a clearly defined term within the oil and gas industry, and is but one
of the valuable rights in the "bundle of interests" known as the mineral estate. Drawing on this
definition, we cannot conclude that the term "unproduction royalty" is patently ambiguous. When
we attribute to the will language its common, ordinary meaning, we find that the term "production"
is defined as "the act or process of producing." (11) In the context of this will, the term "production"
necessarily refers to the act or process of producing oil and/or gas. The prefix "un" means to "do
the opposite of: reverse (a specified action)." (12) Given these definitions, the term "unproduction"
in Slaughter's will means to cease production or not to produce oil and gas. When the terms
contained in the clause in question ("production royalty and unproduction royalty") are clarified by
these definitions, we find that the term "unproduction royalty" has a rather straightforward meaning,
i.e.,  those  payments  made  in  lieu  of  production  royalties  upon  cessation  of  production,  that
is, shut-in royalties.

 When a well is shut-in, it is by definition not producing oil and/or gas; payments are made
by the lessee for the privilege of shutting in a well until the market for oil and gas becomes more
robust. In the context in which the term "unproduction royalty" was used in this will, such term is
not susceptible to more than one reasonable meaning. As such, the term "unproduction royalty" is
not ambiguous. 

 We do not find paragraph four (13) or the second paragraph five (14) to obscure the meaning of the
term "unproduction royalty." When possible, all parts of the will must be harmonized; a latter clause
in a will must be deemed to affirm, not to contradict, an earlier clause in the same will. Steger, 134
S.W.3d at 372. To us, it is clear that Slaughter intended his sons to share equally in all personal
property and, individually, to receive specific tracts of real property, with the exception of the royalty
interest (which necessarily includes the shut-in royalty interest). The partition of the surface estate
by Slaughter's sons (while leaving the mineral estate intact) is not evidence of Slaughter's intent at
the time he drafted his will. This type of extrinsic evidence may not be used to create an ambiguity. 
See Lang, 35 S.W.3d at 640. We are charged with the responsibility to focus on the meaning of the
words Slaughter actually used, rather than speculating concerning what he may have intended to
write. Id. at 639. Said another way, "the intent must be drawn from the will, not the will from the
intent." Id. at 640.

 The will of Slaughter was unambiguous. Each son was devised a separate tract of land,
together with all mineral interests beneath the respective tract devised to him, except for royalties
("production royalty") and shut-in royalties ("unproduction royalty") paid on any well on any of the
surface acreage devised in the will. No other interests in the "bundle of interests" known as the
mineral estate were reserved in the will. These remaining interests were thus devised to each of
Slaughter's three sons individually. These unreserved rights include bonus payments, executive
rights, delay rentals, and the right to explore and develop (the right of ingress and egress).

 We reverse the judgment of the trial court and render judgment that each of Slaughter's three
sons was devised a separate tract of land, together with all mineral rights and interests beneath the
respective tract devised to him, excepting from those mineral interests only the royalties and shut-in
royalties paid or to be paid on any well on any of the land devised in Slaughter's will; which royalties
and shut-in royalties are interests which shall be shared equally among the three sons or their estates,
heirs, or assigns.



 Josh R. Morriss, III

 Chief Justice


Date Submitted: December 30, 2009

Date Decided: January 20, 2010


1. Slaughter drafted the will in 1955. After his death, the will was admitted to probate as a
muniment of title.
2. Slaughter's sons and the beneficiaries under the will are Tommy Slaughter, Willie Slaughter,
and Charley Slaughter (we will refer to the sons by their first names).
3. This action was filed September 17, 2008. Both Willie and Charley answered the
declaratory judgment action. Thereafter, on April 6, 2009, Willie died. A suggestion of death was
filed in the lawsuit April 8, 2009. On June 9, 2009, a motion for substitution of parties was filed,
seeking to substitute Pamela J. Kelley and Jerry W. Slaughter, independent co-executors of the estate
of Willie, in place of Willie. While a separate order of substitution was not executed, the trial court
implicitly  authorized  substitution  of  the  parties  in  the  declaratory  judgment  filed  of  record
August 11, 2009. 
4. All such lands were bequeathed under the holographic will to Slaughter's three sons.
5. In the years since Slaughter died, his three sons partitioned the lands and held individual
ownership in the surface rights. The sons treated the mineral estate as being owned in common, and
shared together in all benefits flowing from lease agreements executed on any of their respective
properties. 
6. The record reflects that Abney and Charley appeared in person at trial, but were not called
on to testify. The sole exhibit introduced at trial was the holographic will of Slaughter.
7. There are two paragraph fives in the will; it is the second such paragraph we address.
8. We find in the record items of purported evidence, not marked as exhibits at trial and not
introduced as evidence at trial, as follows: (1) partition deed dated July 15, 1965, by and between
Charley Sidney Slaughter, Tommy B. Slaughter, and Willie Slaughter, in which Slaughter's real
property was partitioned equally between his sons; (2) oil, gas, and mineral lease by and between
Tommy B. Slaughter and Amoco Production Company dated September 1, 1976; (3) oil, gas, and
mineral lease by and between Willie Slaughter and Amoco Production Company dated July 1, 1987;
and (4) oil, gas, and mineral lease by and between Sidney Slaughter and Amoco Production
Company dated July 1, 1982. These items were not filed with the trial court, and the record does not
indicate that the trial court took judicial notice of these documents. These documents appear in the
record of this Court attached to exhibit P-1 (copy of Slaughter's will introduced at trial by Abney). 
We further note that, even if these documents were properly a part of the record, they are not
evidence of Slaughter's intent at the time he drafted the will. 
9. There is no evidence in the record reflecting the extent of Slaughter's education or his
knowledge of the various terms of art used to describe the mineral estate.
10. The trial court did not appear to rely on the oil and gas leases executed by each of the three
sons in its determination of Slaughter's intent. 
11. Merriam Webster's Collegiate Dictionary 991 (11th ed. 2003)
12. Merriam Webster's Collegiate Dictionary 1358. 
13. "Share and share alike all stock, all farm tools, money in banks."
14. "Each one, same interes [sic] in each piece of royalty. Can't sell royalty nor land . . . ."


ayout v:ext="edit">
 
 









 
 
 
 
 
 
 




 

 

 

 

 

 

 

 

 

                                                         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-10-00062-CV

                                                ______________________________

 

 

 

                   IN THE INTEREST OF M.A. AND H.L.A.,
CHILDREN

 

 

                                                                                                  


 

 

                                      On Appeal from the 102nd
Judicial District Court

                                                             Bowie County, Texas

                                                      Trial Court No. 09C0927-102

 

                                                    
                                              

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                            Memorandum Opinion by Justice Moseley








                                                     MEMORANDUM 
OPINION

 

            This
is an appeal of a final order in a suit affecting the parent-child relationship
brought by Ashley Thomas, the mother of M.A. and H.L.A., minor children.  Michael and Sandra Garrett (who characterize
themselves in trial court pleadings as the childrens Godgrandparents) filed
a petition seeking to be appointed nonparent joint managing conservators.  In their pleadings, the Garretts alleged that
they had the actual care, control, and possession of the children for a period
exceeding ninety days before the suit was filed.  After a hearing, the trial court signed a
final order finding the allegations in the Garretts petition to be true,
appointing the Garretts nonparent joint managing conservators, appointing
Thomas possessory conservator, and ordering Thomas visitation to be both
restricted and supervised.  Thomas timely
filed a notice of appeal. 

            In
her pro se brief, Thomas states she filed an appeal because of the lack of
witnesses and the fact that none of my [accomplishments] or effort in trying
to have my children home were presented to the trial court.  We have construed Thomas briefing as a
complaint that the trial court abused its discretion in appointing the Garretts
as joint managing conservators and challenging the sufficiency of the evidence
to support the trial courts implied findings. 
The Garretts failed to timely file an appellees brief.  See
Tex. R. App. P. 38.6.  After giving the Garretts notice, we set this
cause for submission without an appellees brief.

            Section
153.131 of the Texas Family Code creates a rebuttable presumption that the
appointment of the parents as managing conservators is in the best interest of
the child.  Tex. Fam. Code Ann. § 153.131(a) (Vernon 2008); In re M.T.C., 299 S.W.3d 474, 481 (Tex.
App.Texarkana 2009, no pet.).  Although
Section 153.372 authorizes a trial court to appoint nonparents as joint
managing conservators if such an appointment is in the best interest of the
child,[1]
Section 153.131 provides:

[U]nless the court finds that appointment of the
parent or parents would not be in the best interest of the child because the
appointment would significantly impair the childs physical health or emotional
development, a parent shall be appointed sole managing conservator or both
parents shall be appointed as joint managing conservators of the child.

 

Tex.
Fam. Code Ann. § 153.131(a).  [I]n
an original proceeding for a conservatorship determination, even evidence that
the nonparent would be a better custodian is insufficient to support the
appointment of a nonparent as managing conservator in preference to a parent.  M.T.C.,
299 S.W.3d at 481 (quoting Lewelling v.
Lewelling, 796 S.W.2d 164, 167 (Tex. 1990)).  Rather, the nonparent is required to affirmatively
prove by a preponderance of the evidence that appointment of the parent as
managing conservator would significantly
impair the child, either physically or emotionally.  Id.
(quoting Lewelling, 796 S.W.2d at
167).

            We
further note the trial court made no explicit finding that the appointment of
Thomas as a managing conservator would significantly impair the child, either
physically or emotionally.  On the other
hand, Thomas did not request the trial court to issue findings of fact or
conclusions of law.[2]  This Court has recognized that when no
findings of fact or conclusions of law are requested or filed, it is therefore
implied the trial court made all the findings necessary to support its
judgment.  In re Naylor, 160 S.W.3d 292, 294 (Tex. App.Texarkana 2005, pet.
denied); see Agraz v. Carnley, 143 S.W.3d 547, 554 (Tex. App.Dallas 2004, no
pet.).  

            A
trial courts order regarding conservatorship
is reviewed under an abuse of discretion standard.  In re J.A.J.,
243 S.W.3d 611, 616 (Tex. 2007); Gillespie v. Gillespie, 644 S.W.2d 449,
451 (Tex. 1982).  A trial court abuses
its discretion if it acts arbitrarily and unreasonably or without reference to
any guiding principles.  Downer v.
Aquamarine Operators, Inc., 701 S.W.2d 238, 24142 (Tex. 1985).  The legal and factual sufficiency of the
implied findings may be challenged on appeal. 
Agraz, 143 S.W.3d at 554.  A finding that the appointment of a parent as
managing conservator would significantly impair the childs physical health or
emotional development is governed by a preponderance-of-the-evidence
standard.  Tex. Fam. Code Ann. § 105.005 (Vernon 2008); J.A.J., 243 S.W.3d at 616.

            Further,
Thomas has not provided this Court with a reporters record for this
appeal.  If the record is incomplete and
the appellant has not complied with Tex.
R. App. P. 34.6(c), the appellate court must presume that the omitted
evidence supports the judgment or order from which the appeal is taken.  In re
Estate of Arrendell, 213 S.W.3d 496, 503 (Tex. App.Texarkana 2006, no
pet.); see Bennett v. Cochran, 96
S.W.3d 227, 230 (Tex. 2002); Schafer v.
Conner, 813 S.W.2d 154, 155 (Tex. 1991). 
We are unable to conclude the trial court abused its discretion.  Thomas issues are overruled.

            For
the reasons stated, we affirm the judgment of the trial court.

 

 

                                                                        Bailey
C. Moseley

                                                                        Justice

 

Date Submitted:          November
18, 2010

Date Decided:             November
19, 2010











[1]Tex. Fam. Code Ann. § 153.372(a) (Vernon
2008).

 





[2]Findings
of fact shall not be recited in a judgment, but are required to be filed
separately.  Tex. R. Civ. P. 299a. The legislature made it clear in
enacting the family code that, unless expressly provided otherwise, suits
affecting the parent-child
relationship are to be governed by the same rules of procedure as those
generally applied to other civil cases.  In re E.A.C., 162 S.W.3d 438, 442 (Tex.
App.Dallas 2005, no pet.) (citing Tex.
Fam. Code Ann. § 109.002(a) (Vernon 2008)).