

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00081-CV
_____

IN RE:
ESTATE OF GEORGE SLAUGHTER, DECEASED

On Appeal from the County Court at Law
Harrison County, Texas
Trial Court No. 7030

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

OPINION

When George Slaughter drafted his holographic will in 1955, little could he foresee that this brief, handwritten document would become the subject of litigation in the year 2009. This case is an appeal from a declaratory judgment interpreting the Will of Slaughter.

The issue before us is whether Slaughter intended to devise all of the mineral rights in his estate to his three sons to be held in common or whether he intended to devise only the royalties to his three sons to be held in common, with the remainder of the mineral estate passing to each of the sons in equal but separate interests.

The trial court determined the will to be patently ambiguous and determined Slaughter's intent was to devise all of the mineral rights to his three sons, to be held in common. Because we find the will to be unambiguous, and because the trial court erred in failing to ascribe the ordinary and generally accepted meaning to the language of the will, we reverse the judgment of the trial court and render judgment favoring the position espoused by Cary Abney, the independent executor of Slaughter's estate, as more particularly set out at the end of this opinion.

When Slaughter died in 1965, he left a holographic will,[1] which bequeathed to each of his three sons 158 acres of land, thus equally dividing Slaughter's real property. After Slaughter's will

---

[1]Slaughter drafted the will in 1955. After his death, the will was admitted to probate as a muniment of title.

2

was probated, his sons[2] partitioned the property (into three 158-acre tracts) per deed recorded in the deed records of Harrison County, Texas. No questions were raised regarding the holographic will until 2006 when Tommy Slaughter died and Abney became independent executor of his estate. Questions arose regarding the correct interpretation of Slaughter's holographic will when Abney attempted to lease the minerals beneath certain lands that were specifically devised to Tommy.

The will provides, *inter alia*, that each of Slaughter's three sons is to "share and share alike production royalty and unproduction royalty." This clause is the only exception or reservation to the otherwise comprehensive bequest as to specific parcels of land to each of Slaughter's three sons.

To obtain clarity and certainty regarding the disputed language in the will, Abney filed an application for declaratory judgment[3] asking the trial court to declare the ownership of the mineral estate (including royalty interests and executive rights) in and to all the lands Slaughter owned at the

---

[2]Slaughter's sons and the beneficiaries under the will are Tommy Slaughter, Willie Slaughter, and Charley Slaughter (we will refer to the sons by their first names).

[3]This action was filed September 17, 2008. Both Willie and Charley answered the declaratory judgment action. Thereafter, on April 6, 2009, Willie died. A suggestion of death was filed in the lawsuit April 8, 2009. On June 9, 2009, a motion for substitution of parties was filed, seeking to substitute Pamela J. Kelley and Jerry W. Slaughter, independent co-executors of the estate of Willie, in place of Willie. While a separate order of substitution was not executed, the trial court implicitly authorized substitution of the parties in the declaratory judgment filed of record August 11, 2009.

time of his death.[4]  Charley and Willie answered the declaratory judgment action, contesting the relief sought.[5]

After a hearing,[6] the court issued its judgment, concluding that each of the three sons and/or legal representatives of their estates are entitled to the executive rights to lease the mineral interests of the mineral estate located under the surface estate to each.  The judgment further ordered that all income derived from the mineral estate of the lands of George, "including lease bonus payments, delay rentals, and royalties, shall be divided equally among the three interest owners of the minerals and royalties . . . ."

Abney appeals, claiming the trial court erred in failing to apply the ordinary, accepted, and legal meaning of certain words and terms within the will pertaining to the excepted portion of the mineral estate from the bequests of real property to each of Slaughter's sons.  The dispute centers on paragraph five[7] of the holographic will.  That paragraph provides that each Slaughter son is to "share and share alike production royalty and unproduction royalty."  The parties disagree as to what

---

[4]All such lands were bequeathed under the holographic will to Slaughter's three sons.

[5]In the years since Slaughter died, his three sons partitioned the lands and held individual ownership in the surface rights.  The sons treated the mineral estate as being owned in common, and shared together in all benefits flowing from lease agreements executed on any of their respective properties.

[6]The record reflects that Abney and Charley appeared in person at trial, but were not called on to testify.  The sole exhibit introduced at trial was the holographic will of Slaughter.

[7]There are two paragraph fives in the will; it is the second such paragraph we address.

4

portion of the fee title of the allocated parcels of land identified in Slaughter's will is covered and controlled by the preceding language. Abney contends that only the royalty that may be produced from such lands is covered by the language at issue. Charley and the estate of Willie contend that the referenced language effectively severed the surface and mineral estates as to the respective tracts of land and vested each son with the surface estate of the land devised to him along with an undivided one-third interest in the mineral estates (including royalty income) under the entirety of the land devised in the will. The issue before the trial court was whether the referenced language covers the entire mineral estate or whether it is limited to that portion of the full mineral estate which is designated as royalty.

### 1. Standard of Review

The determination of whether a will is ambiguous is a question of law. *Harris v. Hines*, 137 S.W.3d 898, 903 (Tex. App.—Texarkana 2004, no pet.); *Hurley v. Moody Nat'l Bank of Galveston*, 98 S.W.3d 307, 310 (Tex. App.—Houston [1st Dist.] 2003, no pet.). If the court can give a certain or definite legal meaning or interpretation to the words used, the will is unambiguous, and the court should construe it as a matter of law. *Steger v. Muenster Drilling Co.*, 134 S.W.3d 359, 373 (Tex. App.—Fort Worth 2003, pet. denied). Questions of law are reviewed de novo. *Harris*, 137 S.W.3d at 903; *see also Cherokee Water Co. v. Freeman*, 33 S.W.3d 349, 353 (Tex. App.—Texarkana 2000, no pet.) (whether deed is ambiguous is question of law subject to de novo review). There were no factual matters at issue in this case; the only issue before the trial court was the application of the law

to the facts. Even in those cases of ambiguous instruments, if the extrinsic evidence is undisputed as to the circumstances, the construction is still a question of law for the court. *Brown v. Payne*, 1142 Tex. 102, 76 S.W.2d 306, 308 (1943); *In re Estate of O'Hara*, 549 S.W.2d 233, 238 (Tex. Civ. App.—Dallas 1977, no writ); *see also Taylor v. Baten*, 481 S.W.2d 450, 451 (Tex. Civ. App.—Beaumont 1972, no writ). We will, therefore, review the trial court's determination of whether the will is ambiguous under a de novo standard of review. In a de novo review, no deference is accorded to the trial court's decision. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998).

### 2. A Bundle of Mineral Rights

All land in Texas is comprised of separate corporeal estates in the minerals and in the surface. *Bagby v. Bredthauer*, 627 S.W.2d 190 (Tex. App.—Austin 1981, no writ). As to the separate estate known as the mineral estate, it is well settled that such estate is comprised of five separate and distinct parts. "A mineral estate consists of five interests: 1) the right to develop, 2) the right to lease, 3) the right to receive bonus payments, 4) the right to receive delay rentals, and 5) the right to receive royalty payments." *French v. Chevron U.S.A.*, 896 S.W.2d 795, 797 (Tex. 1995) (citing *Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986)); *see Veterans Land Bd. v. Lesley*, 281 S.W.3d 602, 615 (Tex. App.—Eastland 2009, pet. filed). When a mineral estate is conveyed, all interests are transferred unless they are specifically reserved to the grantor. *Lesley*, 281 S.W.3d at 616; *French v. Chevron U.S.A., Inc.*, 871 S.W.2d 276, 278 (Tex. App.—El Paso 1994), *aff'd*, 896 S.W.2d

6

795 (Tex. 1995); *Prairie Producing Co. v. Schlachter*, 786 S.W.2d 409, 412 (Tex. App.—Texarkana 1990, writ denied).

> The words "royalty," "bonus," and "rentals" have a well understood meaning in the oil and gas business. Likewise, "minerals" and "mineral rights" have a well recognized meaning. Broadly speaking a reservation of minerals or mineral rights without limitation would include royalties, bonuses and rentals. A conveyance of land without reservations would include all minerals and mineral rights. However, it is well settled that a grantor may reserve minerals or mineral rights and he may also reserve royalties, bonuses and rentals, either one, more or all. Here we have a reservation only of "royalty rights." It is obvious, it seems to us, that this does not include a reservation of bonuses or rentals, but only of an interest in oil, gas or minerals paid, received or realized as "royalty" under any lease existing on the land at the time of the reservation, or thereafter executed by the grantee, his heirs or assigns.

*Schlittler v. Smith*, 128 Tex. 628, 101 S.W.2d 543, 544 (1937). Further, a royalty interest is nonparticipating in nature, and does not entitle the owner to any share of ordinary cash or other bonuses, or of delay rentals. *Masterson v. Gulf Oil Corp.*, 301 S.W.2d 486, 488 (Tex. Civ. App.—Galveston 1957, writ ref'd n.r.e.).

Here, we must determine the proper ownership of the mineral rights Slaughter devised to his sons. In making this determination, we apply the accepted principles of will construction.

3. *Standards for Will Construction*

The cardinal rule for construing a will is to ascertain the true intent of the testator as expressed in the will. *San Antonio Area Found. v. Lang*, 35 S.W.3d 636, 639 (Tex. 2000); *Shriner's Hosp. for Crippled Children of Tex. v. Stahl*, 610 S.W.2d 147, 151 (Tex. 1980). When the will itself is unambiguous, we do not go beyond the will's specific terms in search of the testator's intent.

*Lang*, 35 S.W.3d at 639. A will is ambiguous only when the established rules of construction leave its terms susceptible to more than one reasonable meaning. *Steger*, 134 S.W.3d at 373. Such ambiguity does not arise merely because the parties disagree on the will's interpretation or because of a simple lack of clarity. *See DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999) (construing a contract). The will is unambiguous if the court can give a certain or definite legal meaning or interpretation to the words used. *Id.*

The question, therefore, is not what the testator intended to write, but the meaning of the words he or she actually used. *Lang*, 35 S.W.3d at 639. In this regard, the terms of the will are to be ascribed their plain, ordinary, and generally accepted meanings, unless the instrument itself shows such terms to have been used in a technical or a different sense. *Steger*, 134 S.W.3d at 372; *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996) (construing oil and gas lease). When possible, all parts of the will must be harmonized, and a latter clause in a will must be deemed to affirm, not to contradict, an earlier clause in the same will. *Steger*, 134 S.W.3d at 372. "In this light, courts must not redraft wills to vary or add provisions 'under the guise of construction of the language of the will' to reach a presumed intent." *Stahl*, 610 S.W.2d at 151.

4.      *Construction of Slaughter's Will*

Slaughter devised to each of his three sons (all living at the time of his death) 158 acres of real property. Slaughter also devised to each of his sons "the production and unproduction royalty" in that property, to be shared and shared alike. We must determine if Slaughter's intent in drafting

8

this language was to vest his three sons jointly with the mineral estate underlying the entirety of Slaughter's real property, or whether Slaughter intended to devise to each son the surface and mineral estates of their respective tracts of land (as designated in Slaughter's will) except the right to receive royalties or payments in lieu of royalties.

We note at the outset that there is no evidence in the record as to Slaughter's intent, other than the will itself. Slaughter died over forty years ago, and no evidence of Slaughter's original intent was introduced at trial.[8]

Charley and the estate of Sidney contend that Slaughter's intent that the sons share equally in the mineral estate is evidenced by paragraph four and the second paragraph five of the will. Paragraph four provides that each son shall "share and share alike all stock, all farm tools, money in banks." The second paragraph five provides that "each one, same interes [sic] in each piece of royalty. Can't sell royalty nor land . . . ." While paragraph four evidences an intent that the sons share equally in Slaughter's personal property, it says nothing about the mineral estate. It is

---

[8]We find in the record items of purported evidence, not marked as exhibits at trial and not introduced as evidence at trial, as follows: (1) partition deed dated July 15, 1965, by and between Charley Sidney Slaughter, Tommy B. Slaughter, and Willie Slaughter, in which Slaughter's real property was partitioned equally between his sons; (2) oil, gas, and mineral lease by and between Tommy B. Slaughter and Amoco Production Company dated September 1, 1976; (3) oil, gas, and mineral lease by and between Willie Slaughter and Amoco Production Company dated July 1, 1987; and (4) oil, gas, and mineral lease by and between Sidney Slaughter and Amoco Production Company dated July 1, 1982. These items were not filed with the trial court, and the record does not indicate that the trial court took judicial notice of these documents. These documents appear in the record of this Court attached to exhibit P-1 (copy of Slaughter's will introduced at trial by Abney). We further note that, even if these documents were properly a part of the record, they are not evidence of Slaughter's intent at the time he drafted the will.

9

contended that the second paragraph five is reflective of Slaughter's lack of education, and the conclusion is drawn that it would therefore be inappropriate to attribute to Slaughter knowledge of the various interests which comprise the mineral estate.[9]

Charley and the estate of Sidney further rely for their position on two items of extrinsic evidence: (1) precedent established in the forty plus years since Slaughter's demise, during which time the sons partitioned the surface estate, but left the mineral estate intact; and (2) the fact that each son executed, at different intervals, leases on the same tract of land.

Accordingly, Charlie and Sidney's estate suggest that the term "royalty" in Slaughter's will actually meant "minerals." They contend the will is ambiguous because its language is imprecise (although there is no discussion regarding what language is claimed to be imprecise).

Indeed, the trial court determined the phrase "unproduction royalty" to be patently ambiguous. The court was then able to consider extrinsic evidence of Slaughter's intent. *See Lang*, 35 S.W.3d at 639. In its determination of Slaughter's intent, it appears that the only extrinsic evidence on which the court relied[10] was the partition deed (in which the sons partitioned the surface only). Because the will is unambiguous, the consideration of extrinsic evidence in this circumstance was error.

---

[9]There is no evidence in the record reflecting the extent of Slaughter's education or his knowledge of the various terms of art used to describe the mineral estate.

[10]The trial court did not appear to rely on the oil and gas leases executed by each of the three sons in its determination of Slaughter's intent.

Of the five attributes of the mineral estate, the right to receive royalties was excepted as a part of the separated mineral estate passing to each of the Slaughter sons as part of the devises of their separate tracts of land. *Schlachter* makes it clear that the right to receive royalties is neither the executive right, nor is it the right to receive bonus payments; these are separate, distinct, and independent of each other. *Schlachter*, 786 S.W.2d at 412–13. The terms "royalty," "bonus," and "rentals" all have well established meanings in the oil and gas business. *Schlittler*, 101 S.W.2d at 544. A conveyance of land with no reservations would include a conveyance of the mineral rights. However, a grantor is free to reserve royalties, bonuses, rentals or either one, more, or all. *Id.* Here, as in *Schlittler*, there is a reservation of only royalties, albeit in an unusual turn of phrase. There was no reservation of the executive right, bonuses, or rentals. While Slaughter was free to reserve the executive right, bonuses, delay rentals, or all of these, he did not. Had Slaughter intended to divide the entire mineral estate into equal undivided one-third portions among his three sons, one simple way to accomplish that intent would be to state that the sons "share and share alike in the mineral estate." Here, the term "mineral" is never used. The sole reservation is to "production royalty and unproduction royalty."

Under established rules of will construction, this Court is bound to attribute to the words used their plain, ordinary, and generally accepted meanings. *Steger*, 134 S.W.3d at 372. "Production royalty" most certainly has a clear meaning. The challenge here is the unusual expression, "unproduction royalty."

11

The term "royalty" has a generally accepted meaning within the oil and gas industry, as do each of the attributes of the mineral estate. "Bonus" is defined as "[A] payment that is made in addition to royalties and rent as an incentive for a lessor to sign an oil-and-gas lease." BLACK'S LAW DICTIONARY 206 (9th ed. 2009). "Delay rental" is defined as "a periodic payment made by an oil-and-gas lessee to postpone exploration during the primary lease term." BLACK'S LAW DICTIONARY 1411. "Executive right" is defined as "the exclusive right to lease specified land or mineral rights. The executive right is one of the incidents of the mineral interest." BLACK'S LAW DICTIONARY 651. "Royalty interest" is defined as "a share of production–or the value or proceeds of production, free of the costs of production–when and if there is production." BLACK'S LAW DICTIONARY 1446. "Shut-in-royalty" is defined as "a payment made by an oil-and-gas lessee to the lessor to keep the lease in force when a well capable of producing is not utilized because there is no market for the oil and gas." BLACK'S LAW DICTIONARY 1446.

The term "royalty" is a clearly defined term within the oil and gas industry, and is but one of the valuable rights in the "bundle of interests" known as the mineral estate. Drawing on this definition, we cannot conclude that the term "unproduction royalty" is patently ambiguous. When we attribute to the will language its common, ordinary meaning, we find that the term "production" is defined as "the act or process of producing."[11] In the context of this will, the term "production" necessarily refers to the act or process of producing oil and/or gas. The prefix "un" means to "do

---

[11]MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 991 (11th ed. 2003)

12

the opposite of: reverse (a specified action)."[12] Given these definitions, the term "unproduction" in Slaughter's will means to cease production or not to produce oil and gas. When the terms contained in the clause in question ("production royalty and unproduction royalty") are clarified by these definitions, we find that the term "unproduction royalty" has a rather straightforward meaning, i.e., those payments made in lieu of production royalties upon cessation of production, that is, shut-in royalties.

When a well is shut-in, it is by definition not producing oil and/or gas; payments are made by the lessee for the privilege of shutting in a well until the market for oil and gas becomes more robust. In the context in which the term "unproduction royalty" was used in this will, such term is not susceptible to more than one reasonable meaning. As such, the term "unproduction royalty" is not ambiguous.

We do not find paragraph four[13] or the second paragraph five[14] to obscure the meaning of the term "unproduction royalty." When possible, all parts of the will must be harmonized; a latter clause in a will must be deemed to affirm, not to contradict, an earlier clause in the same will. *Steger*, 134 S.W.3d at 372. To us, it is clear that Slaughter intended his sons to share equally in all personal property and, individually, to receive specific tracts of real property, with the exception of the royalty

---

[12]MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1358.

[13]"Share and share alike all stock, all farm tools, money in banks."

[14]"Each one, same interes [sic] in each piece of royalty. Can't sell royalty nor land . . . ."

13

interest (which necessarily includes the shut-in royalty interest). The partition of the surface estate by Slaughter's sons (while leaving the mineral estate intact) is not evidence of Slaughter's intent at the time he drafted his will. This type of extrinsic evidence may not be used to create an ambiguity. *See Lang*, 35 S.W.3d at 640. We are charged with the responsibility to focus on the meaning of the words Slaughter actually used, rather than speculating concerning what he may have intended to write. *Id.* at 639. Said another way, "the intent must be drawn from the will, not the will from the intent." *Id*. at 640.

The will of Slaughter was unambiguous. Each son was devised a separate tract of land, together with all mineral interests beneath the respective tract devised to him, except for royalties ("production royalty") and shut-in royalties ("unproduction royalty") paid on any well on any of the surface acreage devised in the will. No other interests in the "bundle of interests" known as the mineral estate were reserved in the will. These remaining interests were thus devised to each of Slaughter's three sons individually. These unreserved rights include bonus payments, executive rights, delay rentals, and the right to explore and develop (the right of ingress and egress).

We reverse the judgment of the trial court and render judgment that each of Slaughter's three sons was devised a separate tract of land, together with all mineral rights and interests beneath the respective tract devised to him, excepting from those mineral interests only the royalties and shut-in royalties paid or to be paid on any well on any of the land devised in Slaughter's will; which royalties

14

and shut-in royalties are interests which shall be shared equally among the three sons or their estates, heirs, or assigns.

Josh R. Morriss, III
Chief Justice

Date Submitted:     December 30, 2009
Date Decided:     January 20, 2010